**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Dillon Rock,

          Plaintiff,

v.

N. Cummings, et al.,

          Defendants.

No. CV-20-01837-PHX-DWL

**ORDER**

## INTRODUCTION

In October 2019, several members of the Goodyear Police Department ("Defendants") responded to a 911 call.[1]  The subject of the call was Dillon Rock ("Plaintiff"), who lived with his father in the same neighborhood as the caller.  The caller reported—mistakenly, as it turns out—that Plaintiff had just threatened Plaintiff's parents with a knife.  This information was conveyed to Defendants on their way to the scene.

After Plaintiff became aware of Defendants' arrival, he went into his backyard and hid in a shed.  Before entering the backyard, Officer Miller announced that if Plaintiff did not come out, Officer Miller would release a police dog, Toby, who would bite Plaintiff.  After Plaintiff did not respond to this announcement—which, he contends, he did not hear—several Defendants entered the backyard.  Upon arrival at the shed, and without providing any additional warnings, Corporal Cummings opened the door and Officer

---

[1]    Defendants are Corporal Nathan Cummings, Sergeant Ryan McCarthy, Officer Mike Miller, Officer Scott Preston, Officer Aaron Torres, and Officer Josh White.

Miller let Toby inside.  Toby bit Plaintiff for approximately 41 seconds, dragging Plaintiff out of the shed and causing Plaintiff to sustain extensive arm injuries that later required surgery.

In this § 1983 action, Plaintiff alleges that Officer Miller violated the Fourth Amendment's prohibition against the use of excessive force in two different ways—first, by releasing Toby at all, and second, by allowing Toby to continue biting him for too long—and the remaining Defendants violated the Fourth Amendment by failing to intervene and/or by being integral participants in the violations.  Now pending before the Court is Defendants' motion for summary judgment.  (Doc. 69.)  On June 5, 2023, the Court issued a tentative order addressing the summary judgment motion.  On June 28, 2023, the Court held oral argument.  For the following reasons, the motion is granted in part and denied in part—Officer Miller is not entitled to qualified immunity as to the claim regarding the duration of the bite but the remaining Defendants are entitled to qualified immunity in full.

## BACKGROUND

I.   <u>Events Leading Up To The Incident</u>

On the date of the incident, October 20, 2019, Plaintiff was living with his father, Timothy Rock ("Timothy").  (Doc. 76 at 29.)  Yolanda Rock ("Yolanda"), Timothy's ex-wife and Plaintiff's mother, was also present, as she was visiting for Plaintiff's birthday.  (*Id.* at 31.)

On October 19, 2019, the day before the incident, Plaintiff noticed that Yolanda had a fake Louis Vuitton purse.  (*Id.* at 33.)  He "tried to tell her, 'I don't think that's a good idea, to walk with that when you travel . . . especially in dangerous areas maybe when you travel. . . . I just heard bad stories about objects like that and people." (*Id.*)  To demonstrate his point, Plaintiff said "[w]hat would you do if someone just takes a knife and asks, 'give me that purse?'" (*Id.*)  However, Plaintiff never actually used a knife to threaten Yolanda.  (*Id.* at 32, 37.)

The next morning, Timothy woke Plaintiff up and said, "I know what you did trying

to hurt your mother with a knife.  You're a piece of shit." (*Id.* at 32.)  Plaintiff, who was confused by this accusation, "tried [his] best to try and communicate . . . but [Timothy] wouldn't listen or communicate back." (*Id.* at 32, 34.)  The argument became progressively more intense, and at some point Yolanda attempted to intervene. (*Id.* at 34-35.)  Eventually, out of frustration, Plaintiff "kicked a ladder down that was next to [Plaintiff] by the kitchen, and it landed like 5 feet away from [Timothy and Yolanda]." (*Id.* at 37.)  The ladder didn't hit anyone. (*Id.* at 40.)

At this point, Yolanda and Timothy decided to call the police. (*Id.* at 40-41.)  After Timothy said, "Call them.  I hope they lock him up forever," Plaintiff snatched his parents' phones[2] and threw them on the ground, shattering the screens, in an attempt to prevent them from calling the police. (*Id.* at 41-43.)  Plaintiff explained to his parents, "I can't believe you guys are doing this.  I really need my job.  I—I just got it.  I'm really happy with it."[3] (*Id.* at 42.)  Yolanda and Timothy then left the home and began walking in the direction of the house of a neighbor, Willie Berry ("Berry"). (*Id.* at 44-45.)

Upon arriving at Berry's home, Yolanda and Timothy asked him to call the police; Berry complied. (Doc. 69-1 at 9 [physical exhibit of the 911 call].)  Based on the call, between 5:43 and 5:56 pm, the dispatcher communicated the following to law enforcement:

> RP [reporting party] said neighbors son is acting erratic and threatned the wife with a knife.  He broke their phones.  RP says now all parties are standing ifo the house arguing.  The son is 28 yrs old.  Son is tall & thin, unk colored shirt, blue jeans.  Dad is old, gray beard safari hat, might have been drinking.  RP never saw the knife.  The RP is calling from 17553 across the street and has gone back inside.  Disc with RP, he had no further info other than what the dad came over and said, and asked RP to call 911 for him.  To clarify son threatened mom with a knife-dad asked the RP (neighbor) to call use.

(Doc 69-1 at 11.)

In response to the 911 call, several officers from the Goodyear Police Department

---

[2]    This included both of Yolanda's phones.  (Doc. 76 at 43.)

[3]    Plaintiff agreed with the following premise from defense counsel: "You thought that what was going to happen is the police were going to show up,  they were going to accuse you of disorderly conduct, they were going to arrest you and take you to jail, and as a result of going to jail, you were going to miss work on at least Monday." (Doc. 76 at 46.)

1    were dispatched, including the K-9 unit.  (*Id.*)  The Goodyear Police Department's

2    Standard Operating Procedure 3010 ("SOP 3010") outlines the policy for the use of K-9s

3    in police work.  (Doc. 76 at 95-102.)  Before beginning an "area search", which is defined

4    as "a process in which the K-9 team is utilizing the canine to search a broad defined area,

5    generally within an established perimeter, through the use of the canine's olfactory ability

6    to find any human scent," the "handler will request that all perimeter units make Public

7    Address (PA) announcements from their patrol vehicle advising of the verbal warning that

8    the K9 Unit is being used."  (*Id.* at 99.)  SOP 3010 instructs officers to use a saved audio

9    file and provides a script.[4]  (*Id.*)  SOP 3010 further instructs: "After a reasonable time lapse

10   without a response, the police canine may be deployed.  The search may be conducted on

11   or off lead at the handler's discretion.  The handler will maintain visual contact with the

12   police canine as much as feasible, depending on the location and conditions."  (*Id.*)

13   II.    Video Of The Incident

14       The parties have submitted video footage of the incident, which was captured by

15   Defendants' body-worn cameras ("BWC").  (Doc. 73 [Defendants' notice of filing of BWC

16   footage]).  The facts below are derived from the Court's review of that footage, unless

17   otherwise noted.  *Hughes v. Rodriguez*, 31 F.4th 1211, 1218 (9th Cir. 2022) ("[F]or

18   purposes of ruling on a motion for summary judgment, a district court may properly view

19   the facts in the light depicted by bodycam footage and its accompanying audio, to the extent

20   the footage and audio blatantly contradict testimonial evidence."); *Scott v. Harris*, 550 U.S.

21   372, 380 (2007) ("When opposing parties tell two different stories, one of which is

22   blatantly contradicted by the record, so that no reasonable jury could believe it, a court

23   should not adopt that version of the facts for purposes of ruling on a motion for summary

24   judgment.").  Most of the videos span over 30 minutes, and up to an hour and a half for

25   some of the officers.

26       …

27   _____

28   [4]    The script provides: "This is the Goodyear Police Department K-9 Unit.  You are
completely surrounded.  You must respond immediately and come out with your hands up
or I will release my police dog.  When he finds you, he will bite you."  (Doc. 76 at 99.)

1          A.    **Initial Encounter With Plaintiff's Parents**

2          During the initial portion of the encounter, Corporal Cummings arrives on the scene,

3   along with Officer Chaparro.  Plaintiff's parents can be seen standing in the driveway

4   outside Timothy and Plaintiff's home, and several Defendants proceed to have a

5   conversation with Plaintiff's parents.  As noted below, during this discussion, Timothy did

6   not correct the officers when they suggested (as they had been told by the 911 dispatcher)

7   that Plaintiff was currently armed with a knife and repeated the contention (which the 911

8   dispatcher had also told the officers) that Plaintiff had made threats with the knife:

9          Corporal Cummings: "You guys, who had the knife?"

10         Officer Chaparro: "Alright, what's going on?  Who had the knife?"

11         Corporal Cummings: "Who had the knife, and where is he at?"

12         Timothy (gesturing towards the house): "He's somewhere around the back.  But

13         he's my son, he's fucking drunk—"

14         Corporal Cummings: "Okay, who else is in the house?"

15         Timothy: "What's that?"

16         Corporal Cummings: "Who else is in the house?"

17         Timothy: "Nobody else.  This is my ex-wife, Yolanda.  And I'm—"

18         Corporal Cummings: "So the person who grabbed the knife, is he the only person

19         in the house?"[5]

20         Timothy: "No, he's probably, he's probably—"

21         Corporal Cummings: "Listen to me!"

22         Timothy: "I'm—I am."

23         Corporal Cummings: "Who else is in the house with him?"

24         Timothy and Yolanda: "No one."

25

26   _____

     [5]     Officer Preston arrives on scene at this point and is present with Corporal Cummings
27   and Officer Chaparro.  In his affidavit, Officer Preston states that Corporal Cummings
     asked Timothy where the knife was and Timothy responded, "I don't know he might have
28   thrown it somewhere."  (Doc. 69-1 at 43 ¶ 9.)  This statement is contradicted by both
     Corporal Cummings's and Officer Preston's BWC footage, which do not contain this
     purported line of questioning.

1    Corporal Cummings: "That's what I asked.  Okay."

2    Timothy: "Okay."

3    Officer Miller:[6] "Is he in the house or out back?"

4    Timothy: "He's—I think he's out back."

5    Officer Miller: "Is the gate unlocked?"

6    Timothy: "He's just drunk out of his ass."

7    Officer Miller: "Is the gate unlocked?  Is the gate unlocked?"

8    Timothy: "What's that?"

9    Officer Chaparro: "What's his name?"

10   Timothy: "Dillon."

11   Officer Chaparro: "What's his name?"

12   Timothy: "Dillon."

13   Corporal Cummings: "Is anybody hurt?

14   Timothy: "Nobody's hurt.  But he has, you know he's pretty much destroyed the

15   inside of the house."

16   Corporal Cummings: "Is this your house?"

17   Timothy: "Yes."

18   Corporal Cummings: "Okay."

19   Timothy: "And he threatened my, this is my ex-wife, which, we are great friends.

20   And—there's not a—"

21   Officer Miller: "Find out.  Is there a—is there a lock on the gate?"

22   Timothy: "There's not—there's not a lock on the gate."[7]

23   Officer Preston: "Alright, do me a favor just, stay right here for right now, don't go

24   anywhere."

25   Timothy: "Alright."

26   …

---

27   [6]    Officer Miller arrived, with Toby, while Corporal Cummings and Officer Chaparro
28   were speaking with Yolanda and Timothy.

[7]    At this point, Officer Miller and Toby head toward the backyard.

- 6 -

**B.    Various Defendants Go To The Gate And Plaintiff Hides In The Shed**

At this point in the encounter, Corporal Cummings walks over to the gate, which leads to the backyard, located on the west side of the property.  (Doc. 69-1 at 17 ¶ 6.) Officer Miller, along with Toby, join him at the gate.[8]  As discussed below, the relevant sequence for summary judgment purposes is that, after the officers arrived at the gate, Corporal Cummings observed Plaintiff walking away from them to hide in the shed; Corporal Cummings attempted to communicate with Plaintiff a few seconds later (but Plaintiff was unable to hear the specific words that Corporal Cummings used); and the officers then delayed their entry into the backyard until Plaintiff's dog, which was in the backyard, could be brought under control:

> Officer Preston: "Don't go anywhere.  Alright sir, as I said, just stay right there, okay?"

Officer Preston then joins Corporal Cummings and Miller at the gate.

> Officer Miller: "Dog goes first.  Dog goes first.  Get the gate open, eyes downrange."

> Corporal Cummings: "What's his name?"

> Officer Chaparro: "Dillon."

> Corporal Cummings: "Okay."

Corporal Cummings opens the gate.

> Officer Chaparro: "Oh, dog."

> Officer Preston: "Oh big dog."

Corporal Cummings closes the gate.[9]

> Officer Miller: "There's a big dog back there.  Right at the gate.  Off.  Did you see him?"

---

[8]    While walking to the gate, Corporal Cummings appears to mumble something to himself, but the statement is not audible from his BWC footage.

[9]    After Corporal Cummings turns away from the gate, facing the street, Officer Preston can be heard saying, "Where's your dog at?  Oh, ah, shit!" and then "fuck!" Timothy can be seen laying in the road, with Yolanda standing over him.  Officer Preston and Officer Chaparro then tended to Timothy and dispatched for the fire department. Timothy suffered a "pretty nasty cut" on the back of his head.  (*See also* Doc. 69-1 at 43-44 ¶¶ 14-15 [Officer Preston declaration: "After rolling him over, I located an approximately ½ inch abrasion which was actively bleeding."].)

Officer White:[10] "Is he back there? Or—"

Corporal Cummings: "Yeah he's back."[11]

Unidentified speaker: "Did you see him?"

Corporal Cummings: "Yeah he saw us and dipped back in."[12]

Officer Miller: "What kind of dog is it?"

Unidentified speaker: "Was he [inaudible]?"

Corporal Cummings: "I just—he went back towards the house.  Hey Dillon, Dillon it's Goodyear Police."[13]

(No response from Plaintiff.)

Officer Miller: "We might be better going through the inside."

Corporal Cummings: "Yeah.  So he popped out--"

Officer Miller: "What kind of dog was it?"

Corporal Cummings: "Uh, just a big dog.  Big enough to get shot.  So, he popped out on the side yard, saw me, and then went back.  Hey Dillon, it's the Goodyear Police Department!  Can you hear me?"

---

[10]     Officer White had arrived on the scene just moments prior.

[11]     Officer White then walks around to the east side of the property (but remains close to the street) and stands on a fire hydrant to look around.  Officer White: "I just heard something back there.  He either went in the house or in the shed.  Oh, maybe that's what I heard."  Officer White is speaking to Officer Chaparro, but the other half of the conversation is inaudible and Officer Chaparro's BWC footage was not provided.

[12]     Corporal Cummings' affidavit explains that he saw a "male wearing a dark-colored T-shirt emerge from behind the house.  He looked in my direction then walked east behind the house; at which point I lost sight of him."  (Doc. 69-1 at 17 ¶¶ 8-9.)  Plaintiff does not appear to dispute this.

[13]     About nine seconds elapsed between when Corporal Cummings confirmed that he saw Plaintiff and when Corporal Cummings attempted to communicate with Plaintiff.  Although Plaintiff contends in his summary judgment papers that whether he heard Corporal Cummings is a question of fact for the jury (Doc. 76 at 14), Plaintiff admitted during his deposition that he heard the officers' shouting and hid in the shed in response to the shouting: "I heard shouting from the front, and I knew they were going to be talking to my parents . . . shortly. . . . I went to the shed, and I . . . kind of sat there and cried about why I work so hard to go to work . . . .  I just didn't want to go to jail. . . .  It [the shouting] was indistinct, just—it was far away. . . .  I [believed the shouting was the police but] I didn't know what they were shouting."  (Doc. 76 at 48-49.)  Plaintiff elaborated: "[T]he way I heard them was, like, the most unfriendliest way of calling someone, so I just—I just got—just from fear.  I just went to the shed.  I just—I just thought it would all go away."  (Id. at 49-50.)  Therefore, there is no genuine dispute of fact as to whether Plaintiff initially heard the officers and then hid in the shed in an effort to hide from them.

- 8 -

1        Officer Miller: "Hey Pres."

2        Officer Preston: "Yo."

3        Officer Miller: "Ask them, of them if one of them can grab this dog."

4        Officer Preston: "Yeah, I already did.  Ma'am can you go inside and get the dog?"

5        Officer Miller: "Here do you want a leash?  Off.  Polite."

6        Officer Preston: "Do you want to go through the house?"

7        Corporal Cummings (to Yolanda): "Can we go through the house?"

8        Yolanda: "Yes, we can go through the house."

9        Officer Miller: "Still need to get the dog.  Still need to get the dog."

10        Corporal Cummings: "Yeah."

11        Officer Miller: "Do not let that dog out on my dog, please.  Here.  Off.  Get the gate

12        for her, Preston."

13 Yolanda tries to open the gate, while holding the leash provided by Officer Miller.

14        Yolanda: "Let me go through the other side."

15        Corporal Cummings: "Hold on, hold on, hold on.  Which other side?  Wait!"

16        Yolanda: "From inside the house."

17        Officer Miller: "No you're not going inside."

18        Corporal Cummings: "No!  Come here.  You're not going in the house."

19        Officer Miller: "See if you can grab that dog."

20        Officer Preston: "No!"[14]

21        Corporal Cummings: "Okay, is it a friendly dog?"

22        Officer Miller: "Just make sure his dog don't get to Toby."

23        Yolanda: "Uh, yeah he is."

24        Corporal Cummings: "Okay."

25 At this point in the encounter, the officers and Yolanda retrieve Plaintiff's dog from the

26

---

[14]     During this time, Timothy says, "this has been going on for—since yesterday."
27 Officer Preston then proceeds to get Timothy's name, date of birth, and phone number.
Timothy: "He just needs help."  Officer Preston: "That's what we're trying to do."
28 Timothy: "He's just a fucking druggie fucker."  Officer Preston: "Okay.  Hey [Torres], do
you want to come sit here with this guy?  Fire is en route to check out him, he fell down."

1  backyard, which takes approximately 90 seconds.[15]

2      Corporal Cummings (to Yolanda): "Okay go ahead and wait out on the sidewalk

3      okay."

4      C.      **Officer Torres Interview**

5      Because several officers were present at the scene, and not all of the officers

6  remained in the same place, the Court takes a brief detour to discuss the investigative work

7  of Officer Torres that occurred before the dog bite.  As discussed below, during this

8  sequence, Timothy revealed for the first time that Plaintiff was not, in fact, armed with a

9  knife, but this information was not relayed to the other officers on the scene:

10      While Yolanda, Officer Preston, and Corporal Cummings are removing Plaintiff's

11  dog from the back yard, Officer Torres arrives and begins speaking with Timothy.[16]

12      Timothy: "But today he—he—he threatened my ex-wife, that was the end. That's

13      like—Do not do that."

14      Officer Torres: "What did he say exactly to her?"

15      Timothy: "Oh he was—he's going to kill me, he's going to kill her."

16      Officer Torres: "Kill you.  Did he say how?"

17      Timothy: "Huh?"

18      Officer Torres: "Did he say how?"

19      Timothy: "Yeah he—I don't care how he is saying it because he's a drunken

20      asshole."

21  Officer Preston then arrives with Plaintiff's dog.

22      Timothy: "Hey Leeky.  Come over here.  I'll take him.  I'll hold him."

23      Officer Preston: "Well I can't have you hang on to him because he's pretty strong

24      and so."

25      Timothy: "No, no, he's okay—but he knows me."

---

26  [15]    Additional dialogue relating to the removal of the dog from the backyard has been omitted.

27  [16]    On Officer White's BWC footage, right before this interaction, Officer White says to Officer Chaparro: "Will you just stay there and watch that wall?  Please." He indicates
28  to the wall on the far west side of the property.

1    Officer Torres: "I got it.  I got it.  I got it.  Here you go ma'am, can you hold on to

2    the dog?  So, he's going to kill me he's going to kill her, correct?"

3    Timothy: "What's that?"

4    Officer Torres: "He said kill, that he was going to kill—"

5    Timothy: "Yeah!  He's and he and he's just minutes ago he like threw a whole—"

6    Officer Torres: "I'm going to help you up.  We are just going to move behind this

7    police car for right now, just if you guys can.  We are just going to move behind this

8    police car right now, just across the street.  Here, I'll help you."

9    Timothy: "Yeah, cuz I—I've been drinking, sorry about that."

10   Officer Torres: "Not a problem, not a problem, that's why I'm here."

11   Timothy: "Does he just—"

12   Officer Torres: "Not a problem, not a problem."

13   Officer Torres then escorts Timothy and Yolanda across the street to sit on the curb.

14   Timothy is mumbling incoherently on the walk over.

15   Officer Torres: "Is he still in the house right now?"

16   Timothy: "He's in the house, in the back of the house."

17   Officer Torres: "Okay.  Do me a favor we're just going to sit you down over here."

18   Timothy: "How about right here.  Is this okay?"

19   Officer Torres: "Yeah, gimmie just a second.[17]  What's his name again?"

20   Timothy: "What's that?"

21   Officer Torres: "What's his name?"

22   Timothy: "Who?  Oh.  Dillon.  D-I-L-L-O-N."

23   Officer Torres: "Last name?  What's Dillon's last name?"

24   Timothy: "What's that?"

25   Officer Torres: "What's the last name?"

26   Timothy: "Oh, Rock.  R-O-C-K."

27

28   ---

[17]    Officer Torres walks around the police car.   At this point, Officer Miller's dog warning (discussed in the next section) is audible.

- 11 -

1    Officer Torres:  "Okay and that's your son?"

2    Timothy: "Yes."

3    Officer Torres: "And what's his date of birth?  Do you know?"

4    Timothy: "Uh, [redacted]."

5    Officer Torres: "So did he threaten to kill you—does he have the knife right now?"

6    Timothy: "No."

7    Officer Torres: "No."

8    Yolanda: "He was just—"

9    Officer Torres: "Did he have it with him?"

10   Timothy: "He came in and he broke all our phones."

11   Yolanda: "He was breaking our phones—"

12   Timothy: "And then he threw a fucking whole ladder at her."

13   Officer Torres: "He threw a ladder at you?"

14   Timothy: "Yes."

15   Officer Torres: "Okay."

16   Officer Torres: "Do me a favor ma'am can you just wait over here on this side of
17   the car and then I'll talk to you in a second?  What was your name?"

18   Timothy: "What's that?"

19   Officer Torres: "Yeah, this is your house right here, correct?"

20   Timothy: "Yes."

21   Officer Torres: "Yeah.  Okay.  That's it.  No one else in the house?"

22   Timothy: "No, just—"

23   Officer Torres: "No one else is in there."

24   Timothy: "Just, no, just you know my ex-wife and myself."

25   Officer Torres then proceeds to elicit Timothy's remaining identification (first and last
26   name, phone number, and date of birth).

27   Officer Torres: "Any drug use or anything that you are worried about with him?"

28   Timothy: "What's that?"

Officer Torres: "Any drug use or anything like that?"

Timothy: "No, no, he's—has uh medical marijuana."

Officer Torres: "Okay.  So, what, uh, what upset him today?"

Timothy: "What's that?"

Officer Torres: "What upset him today?"

Timothy: "No, he's just he's just a fucking crazy alcoholic."

Officer Torres: "So, he's drunk?"

Timothy: "Once he drinks, he can't stop."

Officer Torres: "Okay, so, he's been drinking today?"

Timothy: "He's been drinking since yesterday.  He thought his birthday was yesterday."

Officer Torres: "Then, well, so what—what kind of sparked it?  What kind of got him upset that he broke the phones?"

Timothy: "I don't know what this man thinks when he drinks."

Officer Torres: "Okay."

A loud commotion can be heard at this point, drawing the attention of Timothy and Officer Torres.

### D.    Officer Miller Provides A Warning, Which Plaintiff Does Not Hear, And Officers Then Enter The Backyard And Approach The Shed

While Officer Torres is speaking to Timothy and Yolanda,[18] Corporal Cummings and Officers Preston, White, and Miller are standing by the gate, along with Toby.  As discussed below, during the next portion of the encounter, these officers discussed their plan for apprehending Plaintiff; Officer Miller announced that if Plaintiff did not reveal himself, Officer Miller would release Toby—an announcement that Plaintiff, unfortunately, did not hear; and these officers then entered the backyard and headed toward

---

[18]    Sergeant McCarthy's BWC footage demonstrates that he arrived after this conversation with Officer Torres, but before the other officers entered the backyard.  At this time, Officer Torres is leading Timothy and Yolanda, along with the dog, to sit across the street from Timothy's and Plaintiff's house.

the shed:

> Officer Miller: "I'm going to work [Toby] on the 15 [foot lead].  So, I'm going to let him search ahead of us.  Heel!  Off!"

Officer Miller then switches out Toby's 6-foot lead for a 15-foot lead.

> Officer Miller: "Off!"
>
> Officer White: "Did you see him?"
>
> Officer Preston: "We haven't seen him."
>
> Corporal Cummings: "Yeah, so, he popped out to the walkway, looked my direction and then he cut back."
>
> Officer White: "Okay, hold on.  Did you ever—did the dog ever go back there—around the side?  Or was the dog here the whole time?"
>
> Officer Preston: "He was here the whole time."
>
> Officer Miller: "Here.  Off."
>
> Corporal Cummings: "As soon as I opened the gate he came running—"
>
> Officer White: "The dog never left after that?  The reason I'm asking is I heard something on the other over there.  On the other side of the house, over by the shed."
>
> Officer Preston: "Do we have somebody over there?"
>
> Officer White: "Yes.  Chaparro is over there."
>
> Officer Miller: "Well, we will give an announcement."
>
> Officer White: "Okay."
>
> Officer Miller: "And then we can get out of this fatal funnel."[19]
>
> Officer White: "Okay."
>
> Officer Preston: "Gotcha."[20]

---

[19]    Corporal Cummings, in an affidavit, explained that a "fatal funnel" refers to the "narrowness of the entry into the backyard at the gate under circumstances where we have seen the suspect; where the suspect is evading or fleeing; and the inability to defend ourselves in the narrow entryway into the backyard if the suspect possesses and uses a firearm."  (Doc. 69-1 at 17 ¶ 13.)

[20]    At this point, Sergeant McCarthy is approaching the group of four officers and is close enough to hear Officer Miller's announcement.  Another officer is explaining to Sergeant McCarthy that "[Plaintiff] popped his head out and then disappeared."

At this point, Officer Miller verbally (rather than using the speaker on his police vehicle) provides a warning to Plaintiff about the plan to release Toby:

> Officer Miller: "What's his name?  Dillon?  Dillon.  Dillon!  Goodyear Police Department K-9 Unit!  I know you're back there.  You need to make yourself known now or I'm going to send my dog back there and he's going to bite you!  Off!  Dillon!  Goodyear Police Department Canine Unit!  Show yourself now, you're gonna get bit!"
>
> (No response from Plaintiff.)

Unfortunately, Plaintiff did not hear enough of this statement to realize that he was being warned about the possible use of a canine—he only heard the word "police" and everything else was indecipherable.[21]

> Unidentified Speaker: "He could've gone back inside."
>
> Officer White:  "He might have.  We are just clearing the backyard."

After an approximately 12-second pause, Toby leads the group of Corporal Cummings and Officers Miller, White, and Preston into the narrow corridor that leads to the backyard.[22]

In an affidavit, Officer Miller provided the following explanation for why he decided to use Toby to search for Plaintiff:

---

[21]     Plaintiff testified that he did not hear any warnings or announcements related to the use of a canine.  (Doc. 76 at 52 [Q: "So any of the shouting that you hear, do you hear any of the words?" A: "No.  I heard . . . 'police.'"]; *id.* at 54-56 [Q: "When you are actually in the shed that day, do you hear an officer talking and using the word 'shed'?"  A: "No, I heard no language or vocal speech."].)  This testimony is not clearly contradicted by the video footage.  Although Officer Torres's BWC footage demonstrates that Officer Miller's warning was audible across the street, it does not establish that Plaintiff, who was on the other side of the house, inside a shed, would have heard the warning.  Thus, for summary judgment purposes, the Court accepts Plaintiff's testimony regarding his failure to hear the specifics of Officer Miller's warning.  To the extent Officer Miller offers a conflicting factual account on this point—he states in an affidavit that "[t]he announcement[s] were so loud and clear that I learned later that officers who were down the street and to the rear of the above listed house could hear them clearly" (Doc. 69-1 at 33 ¶ 22)—this factual dispute must be resolved in Plaintiff's favor as the non-movant.

[22]     Sergeant McCarthy says to the group "Okay, okay, I'll hang out by the front door."  He then goes to stand by the front door.  Officer Chaparro can also be seen standing at the southwest corner of the property.

[Plaintiff] was suspected of committing the crimes of Aggravated Assault with a weapon as well as preventing the victims from calling 911. Based on dispatch broadcasts received by myself and the other Officers; [Plaintiff] was believed to be armed and dangerous as it had been reported by a citizen he had threatened to harm one or both victims with a knife. It was unknown if [Plaintiff] was still armed with any weapons.[23] [Plaintiff] had direct access to any other possible weapons while in the back yard of the residence as there were tools and other sharp and blunt force objects that I observed lying on the ground in the backyard.[24] [Plaintiff] was attempting to evade police officers on scene by failing to comply with all commands and hiding. [Plaintiff] was contacted by Officer Cummings at first; having the chance to comply but instead decided to run out of his view and hide from the pursuing Officers, including myself. His hiding on private property which he knew, and we did not, and where tools that could be used as weapons were plainly visible created an immediate threat to the pursuing Officers, including myself. It was unknown what [Plaintiff] was willing to do to continue to evade officers or further his crimes. I was in fear for the safety of my fellow officer's lives and my life due to the fact of [Plaintiff] crimes and a knife had been used to aid him in the acts. [Plaintiff] had several opportunities to surrender peacefully to officers. He was aware we were at the residence for him and several announcements were given for him to surrender.[25] It was reported [Plaintiff] was under the influence of alcohol and possibly illegal drugs. It was unknown if [Plaintiff] jumped the block wall in which case he would then pose a direct threat to surrounding neighbors. The decision to deploy a K9 is mine as the handler, and supervisor approval is not necessary in our agency, or generally among law enforcement agencies in the State of Arizona.

(Doc. 69-1 at 33-34 ¶ 24.)

As the officers enter the backyard, Corporal Cummings's gun is drawn, and he and Officer Preston follow closely behind Toby. Officer Miller is behind Corporal Cummings and Officer Preston, holding Toby's leash. Officer White brings up the rear of the group and closes the gate behind him. There's some unidentifiable chatter amongst the officers about potential hazards, such as identifying a window.

---

[23]   Plaintiff disputes these several points, arguing that Officer "Miller declined the opportunity to speak with [Plaintiff's] mother or to direct other officers to do so prior to the use of force. . . . Had he done so, he would have learned that [Plaintiff] had not, at any time, threatened his mother with a knife. . . . A reasonable officer would not have perceived [Plaintiff] as a physical threat, upon entering the side yard where the shed was, because a closed wrought iron gate served as a barrier between the shed and the officers." (Doc. 76 at 13-14.)

[24]   Plaintiff objects to this assumption, arguing that Officer "Miller again relies on hypotheticals and assumptions, including that the shed may have contained edged tools that could have been used as weapons." (Doc. 76 at 13.)

[25]   Plaintiff disputes this point. (Doc. 76 at 13.) As explained elsewhere, there is factual dispute about whether Plaintiff heard Officer Miller's warning.

As the officers round the corner at the end of the corridor, the backyard opens up revealing a pool and a gated patio area.

Officer Miller: "Off!  Off!"

Unidentifiable Speaker: "Go ahead and cover the windows."

Officer Preston: "See him?"

Plaintiff is not in view.

Officer White: "Let's go clear the side of that house real quick."

Officer Miller: "Off!"

Corporal Cummings: "There's a screen on the ground on that side.  I'm going to take this wide."

Officer Miller: "Yup."

Officer White: "—first."

Unidentifiable Speaker: "Watch yourself."

Officer Miller: "Somebody's on my lead."

Officer Preston: "Sorry."

Officer Miller: "Here."

Corporal Cummings and Officers White and Miller then walk around the far edge of the pool with Toby.  Plaintiff is still not visible.

Officer Preston and Sergeant McCarthy[26] stay behind to investigate the gated area to the right of the pool.  There's some general chatter between the two about where Plaintiff may be.  Officer Preston notes that "[a]ll the windows are covered so far."  Meanwhile, on the other side of the yard, Corporal Cummings and Officers White and Miller round the corner past the pool.

Officer Miller: "We got a shed.  [Inaudible command to Toby.]"

Officer Miller: "What's that shed forming?  Is that a gate?"

---

[26]    In Sergeant McCarthy's BWC footage, Sergeant McCarthy leaves his post by the front door and enters the backyard through the same gate as the other officers approximately one minute after he said he would remain by the front door. He joins Officer Preston at the side of the house.

- 17 -

Toby is walking ahead of the officers toward the shed.  The shed is surrounded by a metal fence.  Plaintiff is still not visible.  The gate on the fence door is closed, but not locked.

Corporal Cummings, in his affidavit, explained that "[w]e were not informed what was in the shed; although through common experience I know sheds are locations where metal tools, including sharp or edged tools, are regularly kept."  (Doc. 69-1 at 18 ¶ 21.)  Officers Miller and White echoed the same sentiment.[27]  (*Id.* at 35 ¶ 31; *id.* at 62 ¶ 13.)  The BWC footage reflects that none of the officers verbally expressed this concern while approaching the shed (or during the aftermath of the incident).

Officer White then opens the latch to the mental fence enclosing the shed.[28]  Once the fence is open, Toby takes the lead and walks around the perimeter of the shed.  He is sniffing the shed's edges, while still attached to his lead.

There is no dialogue between the officers while Toby sniffs for approximately 25 seconds.[29]  Toby sniffs along some debris surrounding the shed, which makes a muted rustling sound.  At one point, Toby puts both his front paws on the left side of the shed.

E.   **The Incident**

Much of the dispute in this case turns on what happened during the next portion of the encounter.  As discussed below, the relevant sequence for summary judgment purposes is that the officers approached the shed without providing any additional verbal warnings; Officer Miller instructed Corporal Cummings to open the shed's door; Corporal Cummings did so and stood to the side with his gun drawn; Officer Miller released Toby into the shed before making any visual contact with Plaintiff; Toby began biting Plaintiff's arm and dragged Plaintiff partially out of the shed; Plaintiff began screaming in pain and, after a

---

[27]     Plaintiff disputes this point: "Miller again relies on hypotheticals and assumptions, including that the shed may have contained edged tools that could have been used as weapons.  Miller's argument rests on the faulty premise that [Plaintiff] had heard any of the announcements or commands and was intentionally lying in wait, so to speak."  (Doc. 76 at 13.)

[28]     Corporal Cummings provided in his affidavit that he opened the metal fence to the shed.  (Doc. 69-1 at 18 ¶ 21.)  This is contradicted by the video footage, but any dispute over who opened the fence is not material to the disputed issues here.

[29]     Toby begins sniffing the shed at the 1:02:15 timestamp on Officer Miller's BWC footage.  At 1:02:40, Corporal Cummings opens the shed door.

- 18 -

few seconds, grabbed Toby's lead; Officer Miller yelled at Plaintiff to let go of Toby's lead; approximately 27 seconds into the encounter, Officer Miller instructed Officer White to remove Toby from Plaintiff's arm; and approximately 14 seconds after Officer Miller's command, Officer White removed Toby from Plaintiff's arm.  The entire bite sequence lasted approximately 41 seconds.

Officer Miller: "Open up that shed door."

Corporal Cummings then opens the shed's right-side door with his gun drawn.  From Officers Miller's and White's points of view, the right side of the shed appears empty as soon as the doors open.  Toby is first into the shed and disappears behind the shed's left door, which remains closed.  Plaintiff is crouched on the ground just inside the left door. Approximately three seconds into the encounter, both of Plaintiff's hands are visibly empty, as is the shed.[30]  Officer Miller yells something inaudible.  Toby bites Plaintiff on his left upper arm and Plaintiff can be heard screaming.  Toby is shaking his head back and forth, while attached to Plaintiff's arm, dragging Plaintiff from the shed.  Meanwhile, Officer Miller is pulling on Toby's lead and can be heard saying, "Good boy.  Come out.

---

[30]      Although Defendants do not dispute that Plaintiff's hands were empty and no knife was visible elsewhere in the shed, they contend in their reply brief that the responding officers still believed that "a knife . . . could have been concealed in [Plaintiff's] clothes even if his hands appeared empty."  (Doc. 80 at 3.)  Defense counsel further emphasized this point during oral argument.  Having carefully reviewed the record in light of counsel's argument, the Court concludes that this assertion need not be credited on this record.  As an initial matter, none of the responding officers verbally expressed, in the BWC footage, any continuing concerns about Plaintiff being armed after the shed was opened and Plaintiff's hands were shown to be empty.  More important, no Defendant asserted, in the respective affidavits provided in support of the summary judgment motion, that he continued to believe Plaintiff was armed with a knife after the shed was opened and the bite sequence began.  For example, Officer Miller's affidavit states: "As soon as [Plaintiff] and Toby were pulled out of the shed, I could see [Plaintiff] did not have the knife in his hands."  (Doc. 69-1 at 36 ¶ 42.)  Officer Miller does not express any concern that Plaintiff retained the knife elsewhere, such as in a pocket or waistband.  The relevant portions of the declarations of Corporal Cummings (Doc. 69-1 at 18-20), Sergeant McCarthy (Doc. 69-1 at 26-27), Officer Preston (Doc. 69-1 at 44-45), and Officer White (Doc. 69-1 at 62-64) likewise fail to suggest that there was any continuing concern that Plaintiff retained a knife elsewhere on his person.  Accordingly, Defendants' assertion that they continued to believe Plaintiff was armed with a knife after the shed was opened, and the bite sequence began, need not be credited for summary judgment purposes—it is simply an argument of counsel, appearing in a summary judgment reply brief, that lacks evidentiary support. *Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, n.4 (9th Cir. 2002) ("arguments and statements of counsel 'are not evidence'").

Come out.  Good boy."

Once Toby drags Plaintiff out of the shed by his arm (which takes approximately seven seconds), Plaintiff can be seen holding on to Toby's lead.

Plaintiff (screaming): "Ow, ow, ow!"[31]

Officer Miller: "Let go of the dog!  Let go of the lead!  Do it now!"

Plaintiff: (screaming): "Ow, ow, ow!"

Officer Miller: "Let go of the lead!"[32]

Officer White grabs Toby's head.  Plaintiff can be heard crying and screaming: "Ow, ow!"

At this point, Corporal Cummings and Officers White and Preston (in addition to Toby) can be seen struggling on the ground with Plaintiff.  One of the officers can be heard saying, "give us your arm," "give us your arm," "give us your arm," and eventually, "give us your other arm."  Toby has not released his grip on Plaintiff's left arm.  Plaintiff is crying and mumbling unintelligibly.  Corporal Cummings draws his taser but does not use it.  The video shows one officer holding the same arm that Toby is biting; Plaintiff's other arm is not visible.

Officer Miller: "Let go of the lead!"

The officers then lift Plaintiff and rearrange him, so he is face down.  Plaintiff is howling in pain.  Toby is still latched onto Plaintiff's left arm.

Unidentified speaker: "Give us your arm!"

Toby is shaking his head back and forth on Plaintiff's arm.  Plaintiff is screaming and recoiling from the pain.  Eventually, Corporal Cummings gets control of Plaintiff's right arm.  Another officer yells, "Hey! Hey!"

The audio becomes muffled, but Plaintiff's screams can still be heard.  Approximately 27 seven seconds into the encounter, Officer Miller instructs Officer White to remove Toby.

---

[31]     Plaintiff's screams can be heard around the side of the house.  At this point, Officer Preston leaves his post along the side of the house by the pool and runs to the backyard. Sergeant McCarthy follows after him.

[32]     Audio of Officer Miller yelling "let go of the lead" is also audible on Officer Torres's BWC footage.

Officer Miller: "Josh how about you take [Toby] off.  Get him off.  Take him off."[33]

According to the officers' testimony, the only way to remove Toby is for one of the officers to manually put Toby in a chokehold to release him.  (Doc. 69-1 at 63 [Officer White affidavit].)  In the BWC footage, Officer White begins to employ the chokehold.

Officer White: "Got him.  I got him.  Got him."

Plaintiff is yelling in pain: "Owww!  My fucking arm man, oh my arm!  Ahhhh!"

Approximately 14 seconds later (41 seconds after the beginning of the bite), Officer White removes Toby from Plaintiff's arm.

Officer Miller: "Grab his harness!  Grab his harness!"

Officer White: "I got it."

Corporal Cummings and Officer Preston then handcuff Plaintiff while he is lying face down in front of the shed, which occurs approximately nine minutes and eight seconds after Corporal Cummings first arrived.

Sergeant McCarthy, who is observing, says "Dog out.  Dog out."  Officer Miller escorts Toby away from Plaintiff.  An officer can be heard radioing for medical attention for a dog bite.  (Doc. 69-1 at 45 ¶ 27 [Officer Preston declaring that he called for the fire department].)

Officer White: "Get up off his back so he can breathe, Nate."

The videos go on to show Plaintiff receiving medical attention for the dog bite.  Photos were taken of the bite wounds.  (Doc. 76 at 104-05.)  About eight minutes later, Plaintiff is loaded into an ambulance, which took him to Abrazo West Emergency Room for care.  (Doc. 69-1 at 37 ¶ 52.)

F.    **Post-Incident Investigation**

Through the officers' investigative work after the bite, several revelations came to light.

While Plaintiff was being bit, Timothy told Officer Torres that Plaintiff "broke both

---

[33]    At this point, Sergeant McCarthy is several feet outside the metal fence.  Officer Preston is also standing just outside the fence.

phones" by "finding them and throwing them."  In response to Plaintiff's screaming while Toby was on-bite, Timothy remarked, "oh see that's what he is when he's drunk.  When he's sober he's one of the nicest people on the fuckin planet."

About six minutes after the bite, Yolanda told Officer Torres that Plaintiff did not have a knife or make any threats that day.  Officer Torres's BWC footage shows the following exchange:

> Officer Torres: "At any point did he—did he make threats to you guys about killing you or anything like that or hurting you?"
>
> Yolanda: "No he—he says stupid stuff when he's drunk.  When he's sober he's the nicest person in the world. "
>
> Officer Torres: "Nicest person.  But he didn't make threats or anything like that."
>
> Yolanda: "When he's drunk he says stupid stuff and like um—"
>
> Officer Torres: "But today did he say anything in particular?"
>
> Yolanda: "Yeah I mean he said he was like going to beat me up and beat [Timothy] up but he was just saying that—when I saw him with the ladder that's when I told him, he threw it at us so."
>
> Officer Torres:  "Did he did he threaten you with a knife or anything like that?"
>
> Yolanda: "No, not—not right now no.  I don't know why he said that he had a knife because he didn't have it.  Not that I saw him.  He came back he came back I think he came back with a beer and went to his room. . . ."

Yolanda went on to explain that Timothy and Plaintiff were "both drunk" during the argument.

Officer Torres then went to speak with the neighbor, Berry, who called 911.  Berry explained he was outside when Timothy appeared and stated that Plaintiff was "acting a fool" and he "just threatened my ex-wife with a butcher knife and he took our phones and broke them up so we couldn't call 911.  Could you please call for me?"  As in the 911 call, Berry explained that the entire family was outside when he went back inside.  Berry did not see any weapons or hear any threats, just arguing.

- 22 -

Approximately six minutes after the dog bite, and while Plaintiff was receiving medical attention, Officer Preston "beg[an] his investigation" with Timothy.  Officer Preston's BWC footage shows the following exchange:

> Officer Preston: "Alright so Tim, here's what's happening my man, so we got a report of individuals fighting out in front of the house, okay?  That report also the person who called the report in also said that person had a knife."
>
> Timothy: "That was last night."
>
> Officer Preston: "That was last night?  You're sure it wasn't tonight?"
>
> Timothy: "No but today was he was throwing shit and breaking phones and throwing ladders, trying to you know throw a ladder at me, threatening my ex-wife, threating me, 'I'm just going to kill you all.'  Because he was drunk."
>
> Officer Preston: "So, but, all of that happened today?"
>
> Timothy: "Yeah."

Plaintiff had two surgeries to repair the damage in his arm.  (Doc. 76 at 57-58.)  Plaintiff also reported nerve damage that required physical therapy.  (*Id.* at 58; *see also* Doc. 76 at 11.)[34]

## DISCUSSION

I.   Legal Standard

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue

---

[34]   Defendants appear to dispute some of Plaintiff's evidence regarding his injuries and surgeries.  (Doc. 80 at 11-12 ["Plaintiff offers no facts regarding the force of Toby's bite, and no medical evidence regarding causation as to further surgeries, or the seriousness, complexity, or prognosis as to those surgeries.  Indeed, although Plaintiff asserts severe injuries requiring two surgeries, he cites only to his own testimony and offers no medical documentation.  Although [Plaintiff] can testify from personal knowledge that he suffered a wound to his arm and that he later required surgeries, absent any medical records or medical opinion evidence, his lay opinions or observations are insufficient to demonstrate the medical severity of the injuries."].)  These objections are unavailing—Plaintiff obviously has personal knowledge of his own surgeries, and the photos in the summary judgment record (Doc. 76 at 104-05) depict gruesome injuries.

in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018). "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors*, 771 F.3d at 1125 (internal quotation marks omitted). A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Id.* at 1102-03. But if the movant meets its initial responsibility, the burden then shifts to the nonmovant to produce evidence to support its claim or defense. *Id.* at 1103. The nonmovant must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and emphasis omitted); *see* Fed. R. Civ. P. 56(c)(1). There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted). At the same time, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. Thus, "the trial judge's summary

judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

II.   Officer Miller

Plaintiff asserts two theories of liability with respect to Officer Miller—first, that Officer "Miller's initial decision to sic the dog on [Plaintiff] without adequate warnings was . . . unreasonable"; and second, that Officer "Miller . . . allowed Toby's bite to continue for an excessive period while aware that [Plaintiff] was unarmed and recoiling from the pain." (Doc. 76 at 21.  *See also* Doc. 1 ¶ 37 ["Neither the use of the police dog nor the duration of the use was objectively reasonable.  As such, both the decision to use Toby and the duration of the use of force were excessive."].)  In response, Defendants contend that "[q]ualifed immunity is the defense here."  (Doc. 69 at 2.)

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  Thus, "[w]hen an officer asserts qualified immunity as a defense, . . . [courts] first ask whether the facts taken in the light most favorable to the plaintiff show that the officer's conduct violated a constitutional right.  If so, [courts] then ask whether the right in question was clearly established at the time of the officer's actions, such that any reasonably well-trained officer would have known that his conduct was unlawful."  *Orn v. City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020) (citation omitted).  "Although [courts] must view the facts in the light most favorable to the nonmoving party, when considering qualified immunity, [courts] are also limited to considering what facts the officer could have known at the time of the incident."  *Davis v. United States*, 854 F.3d 594, 598 (9th Cir. 2017).

When the defense of qualified immunity is raised in a § 1983 action involving a claim of excessive force, the first prong of the qualified-immunity analysis requires an assessment of whether the force used was "objectively reasonable," which "is determined

by an assessment of the totality of the circumstances." *Green v. City & Cnty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014). *See also Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994) ("[W]e start from the fundamental premise that the use of force to effect an arrest is subject to the Fourth Amendment's prohibition on unreasonable seizures."). When evaluating the totality of the circumstances, courts must "balance the 'nature and quality of the intrusion' against the 'countervailing governmental interests at stake.'" *Green*, 751 F.3d at 1049 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "To assess the gravity of the government interests, [courts] have typically considered (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. Where these interests do not support a need for force, *any* force used is constitutionally unreasonable." *Id.* (citations and internal quotation marks omitted). "Because this inquiry is inherently fact specific, the determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases." *Id.* (citation and internal quotation marks omitted).

The reasonableness of the use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. "Where an officer's particular use of force is based on a mistake of fact, [courts consider] whether a reasonable officer would have or *should* have accurately perceived that fact." *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011). *See also Estate of Strickland v. Nev. Cnty.*, 69 F.4th 614, 621 (9th Cir. 2023) (granting qualified immunity to officers who fatally shot a suspect based on the mistaken belief that the plastic replica gun he was holding was a real gun: "Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of an immediate threat, and in those situations courts will not hold that they have violated the Constitution.")

(citation and internal quotation marks omitted).

For purposes of the second step's "clearly established" inquiry, although there need not be a "case directly on point," "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. In other words, the case law must "have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017). *See also Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) ("This Court has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.") (internal quotation marks omitted); *Sharp v. Cnty. of Orange*, 871 F.3d 901, 910-11 (9th Cir. 2017) ("The Supreme Court has repeatedly instructed that we examine whether the violative nature of particular conduct is clearly established by controlling precedent, not whether the conduct violates a general principle of law. . . . Except in the rare case of an 'obvious' instance of constitutional misconduct . . . , Plaintiffs must identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment. In other words, Plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert these [defendants] in this case that their particular conduct was unlawful.") (cleaned up). "[T]he prior precedent must be 'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction." *Sharp*, 871 F.3d at 911 (citation omitted). *See also Tuuamalemalo v. Greene*, 946 F.3d 471, 477 (9th Cir. 2019) ("The right must be settled law, meaning that it must be clearly established by controlling authority or a robust consensus of cases of persuasive authority."). Additionally, "[o]nce the defense of qualified immunity is raised by the defendant, the plaintiff bears the burden of showing that the rights allegedly violated were 'clearly established.'" *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1157 (9th Cir. 2000). *See also Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991) ("The plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged

misconduct.").[35]

A.      **Theory One: Initial Decision To Deploy Toby**

Although it "is often beneficial" to begin the qualified-immunity analysis by addressing whether a statutory or constitutional right has been violated, district courts are vested with discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). *See also Orn*, 949 F.3d at 1174 ("We have the discretion to skip the first step in certain circumstances, as when the officer is plainly entitled to prevail at the second step."); *Sjurset v. Button*, 810 F.3d 609, 615 (9th Cir. 2015) ("If indeed the [Defendants] did not violate clearly established law, then we can determine that qualified immunity is appropriate and may thus dispose of the case without undertaking an analysis of whether a constitutional violation occurred in the first instance.").

Here, the Court begins with the second prong when analyzing Plaintiff's first theory of liability as to Officer Miller—specifically, that Officer "Miller's initial decision to sic the dog on [Plaintiff] without adequate warnings was . . . unreasonable." (Doc. 76 at 21.) Plaintiff identifies the following cases as supplying the clearly established law supporting that theory: (1) *Mendoza v. Block*, 27 F.3d 1357 (9th Cir. 1994); (2) *Chew v. Gates*, 27 F.3d 1432 (9th Cir. 1994); and (3) *Penaloza v. City of Rialto*, 836 F. App'x 547 (9th Cir. 2020). (*Id.* at 21-23.) Defendants respond that these cases do not suffice for qualified-immunity purposes. (Doc. 80 at 5, 11. *See also* Doc. 69 at 16-17 [summarizing *Chew*].)

The Court agrees with Defendants—Plaintiff's cited cases do not supply the sort of

---

[35]     Although *LSO* and *Romero* place the burden on the plaintiff, other Ninth Circuit opinions hold that "[q]ualified immunity is an affirmative defense that the government has the burden of pleading and proving." *Frudden v. Pilling*, 877 F.3d 821, 831 (9th Cir. 2017). These opinions are difficult to reconcile. *See generally Slater v. Deasey*, 943 F.3d 898, 909 (9th Cir. 2019) (Collins, J., dissenting from denial of rehearing en banc) ("The panel committed . . . error in suggesting that Defendants bear the burden of proof on the disputed qualified-immunity issues presented in this appeal . . . . [T]he applicable—and well-settled—rule [in the Ninth Circuit] is that the plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct.") (cleaned up).

clearly established law that is necessary to overcome Officer Miller's claim of qualified immunity as to Plaintiff's first theory of liability. In *Mendoza*, the plaintiff "robbed a bank in Hacienda Heights, California. He fled first in his car, then abandoned the car and fled on foot. He ran about a half-mile, then crawled under some bushes on private property and hid." 27 F.3d at 1358. After several hours, a helicopter appeared and made "at least twenty" announcements that Mendoza "was surrounded and that a dog might be deployed." *Id.* Mendoza, however, contended that he did not hear those announcements. *Id.* The dog eventually found Mendoza, who "covered his face with his hands." *Id.* Mendoza and the officers provided dramatically different accounts of what happened next. *Id.* at 1358-59. Mendoza asserted that "the dog bit down on his right arm and pulled him out of the bushes," that "no one spoke to him prior to the bite," and that once he was out of the bushes, "the deputy handling the dog put a gun to his head" and after he was handcuffed, "the dog switched its bite to his other side, wounding him again." *Id.* at 1358. Meanwhile, the officers asserted that Mendoza "struggled with the dog" and eventually "broke loose" and then disregarded an "order[] to stop struggling and place his hands behind his back for handcuffing" and instead "resisted[] and even swung an arm at one of the deputies." *Id.* at 1358-59. By agreement of the parties, the district court held an evidentiary hearing to resolve the factual disputes. *Id.* at 1359.[36] The district court resolved most of the factual disputes in the officers' favor and then ruled that they were entitled to qualified immunity. *Id.* at 1362-63.

On appeal, "Mendoza argue[d] that the use of a police dog in this case constituted excessive force." *Id.* at 1361. In reviewing the district court's decision, the Ninth Circuit held that "the deputies' use of the police dog is subject to excessive force analysis, and that this law is clearly established for purposes of determining whether the officers have qualified immunity." *Id.* at 1362. The court further remarked:

---

[36]    As Plaintiff points out, this is a unique procedural posture. (Doc. 76 at 19 ["An important procedural distinction of *Mendoza* is that the court resolved disputed questions of fact prior to making the qualified immunity determination."].)

1
2
3
4
5

> We do not believe that a more particularized expression of the law is necessary for law enforcement officials using police dogs to understand that under some circumstances the use of such a "weapon" might become unlawful.  For example, no particularized case law is necessary for a deputy to know that excessive force has been used when a deputy sics a canine on a handcuffed arrestee who has fully surrendered and is completely under control.  An officer is not entitled to qualified immunity on the grounds that the law is not clearly established every time a novel method is used to inflict injury.

6
7
8
9
10
11
12
13
14
15

*Id.*  Nevertheless, the court affirmed the district court's grant of qualified immunity to the officers, holding as follows: "Mendoza was fleeing arrest for a bank robbery, a felony.  The deputies believed he was armed, due to radio broadcasts from headquarters.  Mendoza did not surrender when warned that he would be bitten if he did not come out of the bushes.  He was hiding on private property and the deputies could reasonably have believed he posed a danger not only to themselves but also to the property owners.  He had not been subdued when the dog bit him the second time.  In fact, once he was out of the bushes, he struggled with the dog, causing the dog to shift its bite.  Using a police dog to find Mendoza, and to secure him until he stopped struggling and was handcuffed, was objectively reasonable under these circumstances."  *Id.* at 1362-63.

16
17
18
19
20
21
22
23

*Mendoza* does not provide the sort of clearly established law that would have imparted notice to Officer Miller that his initial decision to deploy Toby was unconstitutional.  As an initial matter, *Mendoza* holds that it is objectively *reasonable* for an officer to use a canine to apprehend an individual who is suspected of having just committed a felony, flees from the police following the commission of the suspected crime, is believed to be armed, is hiding on private property, and has failed to heed warnings to surrender.  These are, from Defendants' perspective, the exact same factual circumstances that Officer Miller encountered.

24
25
26
27
28

But the issue here isn't whether Officer Miller is entitled to summary judgment under *Mendoza* based on the first prong of the qualified-immunity analysis.  Indeed, due to the procedural posture of this case, some of the factual disputes that were resolved in the officers' favor in *Mendoza* (such as whether the plaintiff heard the warnings) remain unresolved and must be resolved in Plaintiff's favor.  Instead, the issue is whether *Mendoza*

clearly establishes, for purposes of the second prong of the qualified-immunity analysis, that Officer Miller's initial decision to deploy Toby would have been unconstitutional under Plaintiff's version of the disputed facts.  The answer to this question is no.  *Mendoza* did not suggest, much less hold, that the officers' deployment of the canine in that case would have been unconstitutional if any of the disputed facts that had been resolved in the officers' favor during the evidentiary hearing had instead been resolved in the plaintiff's favor.  In fact, the only concrete example provided in *Mendoza* of a scenario where the deployment of a canine would be unconstitutional is "when a deputy sics a canine on a handcuffed arrestee who has fully surrendered and is completely under control."  27 F.3d at 1362.  But those are not the facts here—Plaintiff does not contend that he was already handcuffed, fully surrendered, and completely under control when Officer Miller decided to release Toby.  It follows that *Mendoza* is insufficient to overcome Officer Miller's invocation of qualified immunity as to Plaintiff's first theory of liability.  *Cf. Hernandez v. Town of Gilbert*, 989 F.3d 739, 745 (9th Cir. 2021) (affirming grant of qualified immunity to canine officer accused of excessive force, where the plaintiff proffered *Mendoza* as the clearly established law supporting his position, because *Mendoza* "does not address the 'specific context' of this case" and involved "dissimilar" facts).  In a related vein, although *Mendoza* also suggested that the deployment of a canine might be unconstitutional in "some" unarticulated other "circumstances," 27 F.3d at 1362, the Ninth Circuit and Supreme Court have repeatedly emphasized that these sorts of amorphous pronouncements are insufficient to impart the sort of clear notice that is necessary to overcome a claim of qualified immunity.  *Kisela*, 138 S. Ct. at 1152 ("This Court has repeatedly told courts— and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.").

Next, in *Chew*, the relevant facts there were that "an officer of the Los Angeles Police Department stopped [Chew] for a traffic violation . . . [and] Chew subsequently fled from the officer on foot and hid in a scrapyard.  The officer had not searched him for weapons.  Upon discovering that there were three outstanding warrants for his arrest, the

officer radioed for assistance.  A police perimeter was set up around the scrapyard, and a helicopter and canine units were called in to search for Chew.  Officer Bunch . . . unleashed [police dog] Volker and, approximately two hours after Chew had fled to the yard, Volker found him crouching between two metal bins. . . .  [A]s soon as [Chew] became aware of Volker's presence, he attempted to surrender and yelled to the police to call off the dog . . . [but] Officer Bunch did not immediately accede to Chew's request, . . . Volker bit Chew several times and then seized him, and . . . Chew sustained severe lacerations to his left side and left forearm.  Chew . . . did not offer resistance at any time after he spotted the dog and repeatedly begged the officers to restrain his dog, but that Bunch instead ordered Volker to attack." 27 F.3d at 1436.  One of Chew's claims in the subsequent § 1983 action was a *Monell* claim against the City of Los Angeles, premised on the theory that Officer Bunch had been acting pursuant to a municipal policy governing the use of police dogs to seize fleeing or hiding suspects. *Id.* at 1439.  The district court granted summary judgment to the City on this claim but the Ninth Circuit reversed, holding (as relevant here) that Officer Bunch's decision to release Volker would have been unconstitutional under Chew's version of the disputed facts because, *inter alia*, the manner in which the police dog was deployed meant that the dog "would almost necessarily be out of sight of its handler, and hence beyond the reach of a countermanding order, if and when he came upon Chew"; "[t]he record does not reveal an articulable basis for believing that Chew was armed or that he posed an immediate threat to anyone's safety"; and "[t]his was not an occasion on which the police were forced to make 'split-second judgments' in circumstances that were 'rapidly evolving,'" as "Chew was trapped in the scrapyard for two uneventful hours before Volker bit and mauled him."  *Id.* at 1440-43.

Although *Chew* presents a closer call than *Mendoza*, it is still too factually dissimilar to have imparted notice to Officer Miller that deploying Toby under the specific circumstances of this case would be unconstitutional.  Here, unlike in *Chew*, Officer Miller did not lose sight and control of Toby, had reason to believe at the moment of deployment that Plaintiff was armed with a knife and had just made threats toward others with the knife,

and completed the entire location and seizure sequence in less than 10 minutes after he arrived at the property.  Because *Chew* does not hold that it would be unconstitutional to deploy a canine against a suspect in *those* circumstances, *Chew* is insufficient to overcome Officer Miller's claim of qualified immunity as to his initial decision to deploy Toby. *Shafer*, 868 F.3d at 1117 (the earlier case must arise from "such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law"); *Sharp*, 871 F.3d at 910-11 ("Plaintiffs must identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment.  In other words, Plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert these [defendants] in this case that their particular conduct was unlawful.") (cleaned up).

Before turning to Plaintiff's final cited case, it is important to underscore one of the facts discussed above—Officer Miller's initial belief that Plaintiff was armed with a knife—that distinguishes this case from *Chew* and makes it closer to *Mendoza*.  Although it turns out that Plaintiff wasn't armed with a knife, the undisputed evidence establishes that Officer Miller reasonably believed this to be true at the time he made the initial decision to deploy Toby.  Officer Miller avowed to this point in his affidavit (Doc. 69-1 at 33-36 ¶¶ 24, 35, 41); it is undisputed that Officer Miller was told by the 911 dispatcher that Plaintiff was believed to be armed with a knife (*id.* at 11); the BWC footage shows that Timothy and Yolanda did not initially correct the officers when they suggested (as the 911 dispatcher had told them) that Plaintiff was armed with a knife; and Officer Miller's BWC footage shows that Plaintiff was not in his line of sight—and, thus, he could not have learned that his belief about Plaintiff being armed with a knife was mistaken—during the brief period of time after Corporal Cummings opened the shed but before Officer Miller deployed Toby.  Tellingly, Plaintiff seems to concede in his summary judgment papers that Officer Miller did not become aware of the absence of a knife until, at a minimum, just after Officer Miller deployed Toby.  (Doc. 76 at 7 ["As [Plaintiff] was pulled from the shed with the dog attached to his left arm, it was apparent that [Plaintiff] was unarmed and that

the shed was empty."].)  Accordingly, it is irrelevant—at least for purposes of the § 1983 claim based on the initial decision to deploy Toby—that Officer Miller's belief about Plaintiff being armed with a knife turned out to be wrong.  *Kingsley v. Hendrickson*, 576 U.S. 389, 399 (2015) ("[A] court must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer.").  *See also Estate of Strickland*, 69 F.4th at 621 (granting qualified immunity despite officer's mistake of fact).[37]

In *Penaloza*, Plaintiff's final cited case, Officer Zirkle attempted to pull over a car for an expired registration, prompting the driver to flee.  836 F. App'x at 549.  After the driver stopped, one of the passengers (Goode) got out of the car and knelt on the ground. *Id.*  According to the evidence presented at summary judgment, Officer Zirkle then "intentionally pushed [police dog] Boda toward" Goode, even though Goode "posed no threat to officers and . . . was not fleeing or resisting arrest," causing Boda to bite Goode for 28 seconds.  *Id.*  Under those facts, the district court denied Officer Zirkle's request for qualified immunity and the Ninth Circuit affirmed.  *Id.*  But putting aside the fact that it is questionable whether a December 2020 unpublished decision could serve as clearly established law in this case, which addresses an incident that occurred in October 2019, *Penaloza* is obviously distinguishable because it involved an unarmed plaintiff who was not fleeing and was apparently not even suspected of committing a crime.

Finally, during oral argument, Plaintiff also argued that releasing Toby without warning qualifies as one of the rare situations where conduct is so plainly unconstitutional that it is unnecessary to identify an earlier case finding a constitutional violation under similar circumstances.  The Court disagrees.  To start, those situations should be "rare" and "obvious."  *D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018) ("Of course, there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even

---

[37]    For similar reasons, it is irrelevant that Yolanda and Timothy later told Officer Torres, during separate conversations, that Plaintiff was not armed with a knife.  It is undisputed that Officer Torres did not relay this information to Officer Miller before the deployment.  (Doc. 76 at 9 [Plaintiff's summary judgment brief: "At no point prior to the bite did Torres report to the other officers the statements by Timothy and Yolanda that [Plaintiff] did not have a knife and that [Plaintiff] had not threatened Yolanda with a knife."].)

though existing precedent does not address similar circumstances.") (citations omitted). The facts of this case are not so egregious as to constitute an "obvious" constitutional violation. *Sharp*, 871 F.3d at 912 ("But this obviousness principle, an exception to the specific-case requirement, is especially problematic in the Fourth-Amendment context. When a violation is obvious enough to override the necessity of a specific factual analogue, we mean to say that it is almost always wrong for an officer in those circumstances to act as he did. But that kind of categorical statement is particularly hard to make when officers encounter suspects every day in never-before-seen ways. There are countless confrontations involving officers that yield endless permutations of outcomes and responses. So the obviousness principle has real limits when it comes to the Fourth Amendment.").

For these reasons, Officer Miller is entitled to summary judgment as to any § 1983 claim premised on his initial decision to deploy Toby. Even assuming, as Plaintiff contends, that Officer Miller violated SOP 3010 by providing a verbal warning (which Plaintiff contends he did not hear) instead of using the patrol vehicle's public address system to provide the warning, no case clearly established in October 2019 that it was unconstitutional to deploy a canine under the factual circumstances that Officer Miller confronted. This conclusion, to be clear, is not tantamount to approval of the decision to deploy Toby under those circumstances. *Cf. Manriquez v. Ensley*, 46 F.4th 1124, 1129-31 (9th Cir. 2022) (reversing denial of qualified immunity, even though the officers were found to have violated the Fourth Amendment during the first step of the qualified-immunity analysis, because "the facts [of the earlier decision establishing the constitutional violation] are distinguishable such that it could not have given clear notice to any reasonable officer that a search here would have been unconstitutional").

### B. Theory Two: Duration And Encouragement

As for Plaintiff's second theory of liability—which, again, is that Officer "Miller . . . allowed Toby's bite to continue for an excessive period while aware that [Plaintiff] was unarmed and recoiling from the pain" (Doc. 76 at 21)—the Court will exercise its discretion

to begin with the first prong of the qualified-immunity analysis, which addresses whether a constitutional violation occurred.

### 1.   Constitutional Violation

The Ninth Circuit's decision in *Watkins v. City of Oakland, Cal.*, 145 F.3d 1087 (9th Cir. 1998), helps frame the analysis as to Plaintiff's second theory of liability.  In *Watkins*, a canine officer, Officer Chew, responded to a silent alarm at a commercial warehouse.  *Id.* at 1090.  A person had been seen "running within the building" but there was "no evidence as to whether the person was armed."  *Id.*  Before releasing the dog, Officer Chew made two announcements to surrender.  *Id.*  Watkins did not surrender and claimed that "he did not hear the announcement."  *Id.*  The dog, Nero, was then let off the lead to search, eventually found Watkins, "who was hiding in a car," and bit him.  *Id.*  "Upon arriving at the scene, Officer Chew did not call Nero off of Watkins; instead, he ordered Watkins to show his hands.  Watkins, who was recoiling from the dog's bite, failed to comply.  Officer Chew then pulled Watkins out of the car onto the ground.  Nero continued to bite until Watkins complied with Officer Chew's orders to show his hands," which took about 30 seconds in total.  *Id.*  In the resulting § 1983 action, one of Watkins's theories of liability was that the "duration and extent of force applied in effecting arrest after the officers caught up with [the dog] amounted to an unconstitutional application of force."  *Id.* at 1093 (citing *Mendoza*, 27 F.3d at 1362).  As to that theory, the district court denied Officer Chew's request for qualified immunity and the Ninth Circuit affirmed, holding that it was "clearly established that excessive duration of the bite and improper encouragement of a continuation of the attack by officers could constitute excessive force that would be a constitutional violation."  *Id.*  Here, Plaintiff asserts the same sort of "duration and encouragement" theory of liability that was validated in *Watkins*.  (Doc. 76 at 10 ["[T]he duration of the bite violated [Plaintiff's] Fourth Amendment Right to be free from the use of excessive force."].)

With this backdrop in mind, the Court turns to the parties' arguments regarding whether Plaintiff has presented sufficient evidence to survive summary judgment on such

a claim.   Invoking the *Graham* factors, Defendants argue that Officer Miller used objectively reasonable force under the circumstances because (1) Plaintiff was suspected of committing a serious felony crime (aggravated assault) in a domestic setting; (2) Plaintiff "posed an immediate threat to the safety [of] the pursuing Officers and to neighbors [who] might have encountered [Plaintiff] on his flight"; and (3) Plaintiff engaged in active resistance, including fleeing to a shed after the officers arrived, and failed to heed various warnings.   (Doc. 69 at 13-18.)   In response, Plaintiff contends that the *Graham* factors compel a finding of excessive force because (1) it was a severe use of force to leave Toby "on the bite for 40 seconds, though it was readily apparent to the officers that [Plaintiff] was unarmed and under Toby's control"; (2) Officer "Miller's failure to speak with, or otherwise acquire information from, the reported victim prior to the use of a police dog to apprehend [Plaintiff] was not the conduct of a reasonable officer"; (3) any arguments premised on the warnings given to Plaintiff "rest[] on the faulty premise that [Plaintiff] had heard any of the announcements or commands and was intentionally lying in wait, so to speak"; and (4) "[o]n the facts favorable to [Plaintiff], no reasonable officer would have perceived [Plaintiff] to pose an immediate threat to the safety of the officers or to others so as to justify the release of Toby into the shed without warning."   (Doc. 76 at 11-13.)   As for the duration of the bite, specifically, Plaintiff contends that "[i]t was apparent to [Officer] Miller that [Plaintiff] was unarmed and that the shed was empty as soon as the shed door was opened and seconds into the bite."   (*Id.* at 13.)   Finally, Plaintiff contends that "[v]iewing the video evidence in the light most favorable to [Plaintiff], no reasonable officer would have perceived [Plaintiff's] grab of the leash as a safety threat to Toby or as anything more than [Plaintiff] recoiling and attempting to relieve the pain."   (*Id.* at 14.)

### a.   **Nature And Quality Of Intrusion**

As noted, *Graham* requires courts to "balance the 'nature and quality of the intrusion' against the 'countervailing governmental interests at stake.'"   *Green*, 751 F.3d at 1049 (quoting *Graham*, 490 U.S. at 396).   Here, Toby bit Plaintiff on the arm, dragged Plaintiff from the shed, and continued the bite for approximately 41 seconds (composed of

27 second before Officer Miller gave the command for Officer White to stop the bite, then another 14 seconds before Officer White was able to remove Toby), causing Plaintiff to suffer severe injuries that eventually required two surgeries.  The quantum of force was therefore severe and presents a significant intrusion.  *See, e.g.*, *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003) ("Although the police dog was trained to bite and hold a suspect's arm or leg, not to maul a suspect, Deputy Bylsma permitted the dog to bite and hold Miller for an unusually long time period [45 to 60 seconds], an action that might cause a suspect pain and bodily injury. . . .  We conclude that the intrusion on Miller's Fourth Amendment interests was a serious one."); *Chew*, 27 F.3d at 1441 ("By all accounts, the force used to arrest Chew was severe.  Chew was apprehended by a German Shepherd taught to seize suspects by biting hard and holding."); *Smith v. City of Hemet*, 394 F.3d 689, 701-02 (9th Cir. 2005) ("By even the defendants' account, the force used against Smith was severe.  The Hemet Police Department's use of force policy, General Order U-102, classifies the use of . . . a police service dog as 'intermediate' force . . . [which] is the most severe force authorized short of deadly force.").

### b.  **Governmental Interests**

As noted, "[t]o assess the gravity of the government interests, [courts] have typically considered (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Green*, 751 F.3d at 1049.

### i.  Severity Of Crime

The first factor, the severity of the crime at issue, weighs in favor of Officer Miller. Plaintiff was suspected of committing aggravated assault, a felony, in a volatile domestic setting.  Although Officer Miller and the other officers learned at some point after the apprehension (and one of them, Officer Torres, learned before the apprehension) that the reports concerning the aggravated assault were mistaken, all that matters for constitutional purposes is what Officer Miller reasonably understood at the time of the challenged conduct.  *Kingsley*, 576 U.S. at 399.  Therefore, Officer Miller had a strong interest in using

force to apprehend and arrest Plaintiff. *Miller*, 340 F.3d at 964 ("The government has an undeniable legitimate interest in apprehending criminal suspects, and that interest is even stronger when the criminal is, like Miller, suspected of a felony, which is by definition a crime deemed serious by the state. This factor strongly favors the government."); *Oakry v. City of Tempe*, 2022 WL 4367606, *6 (D. Ariz. 2022) ("There is no dispute that Plaintiff was identified as the perpetrator in an assault. Although the crime was only charged as a misdemeanor, the crime at issue was nonetheless a serious offense characterized by violence, thereby supporting that the force used was reasonable.").

ii.    Immediate Threat To Officers Or Others

The "most important" factor is whether Plaintiff posed an immediate threat to the safety of the officers or others. *Mattos v. Agarano*, 661 F.3d 433, 449 (9th Cir. 2011) (quotations omitted). "A simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (citation omitted).

Unfortunately, Defendants' briefing on this topic focuses almost exclusively on the threat that Plaintiff posed *before* Officer Miller deployed Toby. This approach is unhelpful because, as noted, Plaintiff's second theory of liability is a *Watkins*-style "duration and encouragement" claim, which focuses on the reasonableness and necessity of continued force after the bite began. On that topic, Defendants' only fleeting argument is that continued force was necessary because "after being bitten [Plaintiff] refuse[d] commands to give up his arms and instead [attempted to] fight Toby by grabbing his leash." (Doc. 69 at 18.)[38]

This argument is unpersuasive. Even assuming, as Defendants contend, that Officer Miller's initial decision to deploy Toby was justified by the immediate threat of harm that Plaintiff posed as he was hiding in the shed, it doesn't necessarily follow that Officer

_____

[38]    Similarly, in the portion of their reply addressing the *Graham* factors, Defendants focus exclusively (or nearly exclusively) on the initial decision to deploy Toby and fail to specifically address Plaintiff's "duration and encouragement" theory. (Doc. 80 at 11-13 [questioning whether the intrusion was severe, then discussing why the officers had a strong interest in "finding and controlling" Plaintiff].)

Miller's decision to allow Toby to continue biting Plaintiff for approximately 27 seconds before giving the stop command to Officer White—as Plaintiff was being dragged out of the shed (which was quickly revealed to be empty), screaming in pain, with no weapons visible—was also justified.

To that end, the BWC footage shows that as soon as the shed doors opened, it became obvious that Plaintiff was in an empty shed and had nothing in his hands.  As discussed in footnote 30, although Defendants assert in their reply brief (and reasserted during oral argument) that Officer Miller continued to believe Plaintiff was armed with a knife during this portion of the encounter (because he may have been hiding the knife in his waistband), this is an unsupported assertion that need not be credited for summary judgment purposes.  *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be . . . genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials.").

Accordingly, a reasonable juror could find that Plaintiff did not pose an immediate threat to the officers during most of (let alone the entirety of) the lengthy bite sequence.

### iii.   Evading And Resisting Arrest

The final factor favors Plaintiff for the same reasons.  To be clear, it is undisputed that Plaintiff initially ran from the police and sought to evade arrest.  (Doc. 76 at 51 [Q: "[W]as one of your other purposes to avoid being arrested if possible?" A: "Yes. Definitely."].)   However, the fact remains that Plaintiff stayed on the property—his residence—and hid inside an empty shed.  Viewing the BWC footage in the light most favorable to Plaintiff, he did not run from the police or fight back once Corporal Cummings opened the shed door.  *Getzen v. Yavapai Cnty.*, 2021 WL 3934668, *6 (D. Ariz. 2021), *aff'd sub nom. Getzen v. Long*, 2023 WL 118743 (9th Cir. 2023) ("Even if Plaintiff had fled the apartment, the Ninth Circuit has found that when a suspect flees, but then hides, the suspect's flight has terminated, at least temporarily.") (citing *Chew*, 27 F.3d at 1442).

More important for purposes of Plaintiff's second theory of liability, Plaintiff did not—when viewing the evidence in the light most favorable to him—resist once Toby bit him.  Although it is true, as noted in Officer Miller's affidavit, that Plaintiff did not immediately "present[] his hands and arms to Officers" during the bite sequence and instead "grabb[ed] Toby's 15' lead" and then failed to comply with verbal commands to let go of the lead (Doc. 69-1 ¶¶ 43-45), a reasonable juror could conclude upon watching the video that these were not attempts to resist arrest but efforts to engage in self-protection. *Cf. Aranda v. City of McMinnville*, 942 F. Supp. 2d 1096, 1106 (D. Or. 2013) ("Turning to the third *Graham* factor, Aranda's failure to place his arms behind his back was not necessarily what the Supreme Court meant by 'actively resisting arrest or attempting to evade arrest by flight.'  Viewing the evidence in the light most favorable to Aranda, a jury could find that Aranda's noncompliance was not active resistance to arrest as much as an instinctive effort to protect himself from injury.  In other excessive force cases, the Ninth Circuit has limited the resistance/flight factor to more aggressive or sustained efforts to elude custody.") (citations omitted).  The BWC footage, which is difficult to watch, depicts Plaintiff howling in pain throughout the encounter as a canine is latched onto his arm and actively inflicting wounds (which, according to Plaintiff's evidence, were serious and required multiple surgeries).  Although Plaintiff did not submit a declaration or deposition testimony explaining why he grabbed Toby's lead, the Court disagrees with Defendants' contention during oral argument that this means the fact of Plaintiff's resistance to arrest must be taken as undisputed.  To the extent Defendants attempted, through their submission of affidavits and other evidence, to establish that Plaintiff resisted arrest, Plaintiff successfully created a dispute of fact on that issue by proffering the BWC footage, which a reasonable juror could interpret as contradicting Defendants' resisting-arrest evidence. *See* Fed. R. Civ. P. 56(c)(1).  Thus, Plaintiff's argument that he merely grabbed Toby's lead in an attempt to relieve the pressure on his arm (Doc. 76 at 8, 11, 13-14) is not an unsupported argument of counsel that must be ignored at summary judgment—instead, it is a permissible argument based on the evidence.

c.   **Additional Factors**

The Court next considers "whether there were less intrusive means of force that might have been used." *Lowry v. City of San Diego*, 858 F.3d 1248, 1259 (9th Cir. 2017).

In the context of Plaintiff's second theory of liability—which, again, focuses not on the initial decision to release Toby, but on the duration and encouragement of the bite— this factor requires consideration of the point at which Defendants had control over Plaintiff such that Toby could have been removed.  Plaintiff was outnumbered four-to-one by police officers, was lying face-down on the ground, had nothing in his hands, and was crying and screaming from the pain of the dog bite.  A reasonable juror could find that Officer Miller could have removed Toby earlier.  *Cf. Watkins*, 145 F.3d at 1090 ("Watkins explained that he did not show his hands because he was resisting the dog and recoiling from the pain of Nero's attack.  Watkins further claims that Officer Chew continued to allow Nero to bite him even though he was obviously helpless and surrounded by police officers with their guns drawn.").

At oral argument, Defendants challenged whether there is a genuine dispute as to the point at which Plaintiff could be seen as under Defendants' control.  Plaintiff, in response, noted that when Officer Miller was asked during his deposition, "When Toby had [Plaintiff's] arm, did Toby have control of [Plaintiff]?", Officer Miller responded, "Yes." (Doc. 76 at 92.)  Viewing the BWC footage, in combination with Officer Miller's deposition testimony, in the light most favorable to Plaintiff, a reasonable juror could find that Plaintiff was under the Defendants' control well before Officer Miller gave the command for Officer White to remove Toby from the bite.

d.   **Objective Reasonableness**

For these reasons, material disputes of fact preclude the entry of summary judgment in favor of Officer Miller under the first prong of the qualified-immunity analysis.  Viewing the facts in the light most favorable to Plaintiff, it is for a jury to decide whether Officer Miller's conduct in relation to the duration and encouragement of the bite was reasonable under the circumstances.

2.    Clearly Established Law

As for the second prong of the qualified-immunity analysis concerning his "duration and encouragement" claim, Plaintiff argues that *Mendoza* and *Watkins* "provide the binding precedent that put Miller on notice that his conduct was a clear violation of [Plaintiff's] constitutional rights." (Doc. 76 at 20-23.)  Defendants respond that *Mendoza* and *Watkins* are insufficient because they involved facts that are "simply 'analogous'" to the facts here and argue that relying on such cases would result in "the very same error for which the Ninth Circuit was summarily reversed." (Doc 80 at 5.)  Defendants also argue that *Watkins* is factually distinguishable because "the officer relinquished control of his canine completely, and then when he came up to the location of the canine biting the suspect, he allowed the canine to continue biting under circumstances where he could plainly see the suspect was unarmed and of no threat." (*Id.* at 6.)

For the reasons already discussed, *Mendoza* is of no assistance to Plaintiff when it comes to the second prong of the qualified-immunity analysis.  Although *Mendoza* clearly establishes that it is unconstitutional to "sic[] a canine on a handcuffed arrestee who has fully surrendered and is completely under control," 27 F.3d at 1362, those are not the facts of this case—Plaintiff was not handcuffed, fully surrendered, and in complete control during the bite sequence.

This leaves *Watkins*.  In the Court's estimation, *Watkins* goes significantly further than *Mendoza* in clearly establishing the constitutional limits on the continuation of dog bites because the plaintiff in *Watkins* was *not* handcuffed, fully surrendered, and in complete control during the dog-bite sequence, yet the Ninth Circuit still held that the officer's conduct violated clearly established law.  More specifically:

> Upon arriving at the scene, Officer Chew did not call [police dog] Nero off of Watkins [upon observing the bite]; instead, he ordered Watkins to show his hands.  Watkins, who was recoiling from the dog's bite, failed to comply. Officer Chew then pulled Watkins out of the car onto the ground.  Nero continued to bite until Watkins complied with Officer Chew's orders to show his hands.  Officer Chew . . . testified that ten to fifteen seconds elapsed between the time Officer Chew ordered Watkins to show his hands and the time Watkins complied with that order.  The officers both agree that Nero

continued to bite Watkins throughout that period. . . . [and] Officer Chew [later] stated that the time period was about thirty seconds.  Officer Chew justified his delay in calling off Nero because Watkins, while resisting the dog, failed to show his hands to prove that he was unarmed.  Watkins explained that he did not show his hands because he was resisting the dog and recoiling from the pain of Nero's attack.  Watkins further claims that Officer Chew continued to allow Nero to bite him even though he was obviously helpless and surrounded by police officers with their guns drawn.

*Id.* at 1090.

These are, in substance, the same facts at issue here (at least when the facts are construed in the light most favorable to Plaintiff).  Like Officer Chew in *Watkins*, Officer Miller did not call off Toby after becoming aware that Toby was engaged in the bite but instead ordered Plaintiff to show his hands.  Like the plaintiff in *Watkins*, Plaintiff was unable to comply with this command because of the bite.  And as in *Watkins*, Plaintiff was helpless and surrounded by other armed officers—Corporal Cummings drew but did not deploy his taser—during the bite sequence (which lasted for 41 seconds, which is 11 seconds longer than in *Watkins*, and which was approximately the same length as the sequence in *Watkins* even if limited to the 27-second period before Officer Miller gave the verbal command to Officer White to remove Toby).  The Court recognizes that the second prong of the qualified-immunity analysis creates a high bar, under which the plaintiff must identify "a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment," *Sharp*, 871 F.3d at 910-11, but it is difficult to see how *Watkins* could be said to fail that test.  Other courts have reached the same conclusion in similar cases.  *See, e.g.*, *Hartsell v. Cnty. of San Diego*, 802 F. App'x 295, 296 (9th Cir. 2020) (affirming denial of qualified immunity to Officer Stroh, a canine officer being sued under the theory that his continued use of a police dog "became objectively unreasonable when Hartsell complied with instructions to show his hands, emerged from the brush with the canine attached to his arm, and was within the deputies' control, if not sooner," because "preexisting law [including *Watkins*] gave Stroh fair warning that it would be unlawful to use a canine in a prolonged manner under circumstances such as those alleged by

Hartsell"); *Rosenbaum v. City of San Jose*, 2021 WL 6092205, *13 (N.D. Cal. 2021) ("Because the situation that confronted Officer Dunn when he allowed his police dog to continue to bite Plaintiff was so similar to the situation that the officers in *Watkins* confronted, the Court finds that 'clearly established' Ninth Circuit case law 'clearly prohibit[ted] the officer's conduct in the particular circumstance before him.'  District courts have found similarly in like circumstances.") (citations omitted); *Hernandez*, 989 F.3d at 745 ("Our caselaw is clear that an officer cannot direct a police dog to continue biting a suspect who has fully surrendered and is under the officer's control.").

III.    Remaining Defendants

As for the remaining Defendants (Corporal Cummings, Sergeant McCarthy, and Officers Preston, Torres, and White), Plaintiff asserts two theories of liability: (1) failure to intervene and (2) integral participation.

A.    **Failure To Intervene**

The Ninth Circuit has recognized that, in general, "police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen."  *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000).  "Importantly, however, officers can be held liable for failing to intercede only if they had an opportunity to intercede." *Id.*

The remaining Defendants argue they are entitled to summary judgment on Plaintiff's failure-to-intervene claim under both prongs of the qualified-immunity analysis. (Doc. 69 at 18-19.)  As for the first prong (whether a constitutional violation occurred), they argue that no intervention was constitutionally required because Officer Miller's use of Toby was "proper"; that Officer White did, at any rate, "intervene by controlling Toby and taking him off bite"; that "Sergeant McCarthy and Officer Torres were not at the scene for the decision to deploy, or the deployment of, Toby and could not have intervened even if there were cause to do so"; and that Officer "Preston did not arrive at the area of the shed until after Toby was already on bite."  (*Id.*)  As for the second prong, they argue there is no clearly established law establishing when an officer has a reasonable opportunity to

intervene, so any failure-to-intervene claim necessarily fails.  (*Id.*)

In response, Plaintiff argues that Corporal Cummings, Sergeant McCarthy, and Officers White, Preston, and Torres had the means and opportunity to prevent or stop the alleged constitutional violation.  (Doc. 76 at 23-24.)  "Cummings and Miller were in the immediate vicinity of the shed when Toby was sent in to bite [Plaintiff]" and "[t]hough for a lesser period of time, McCarthy and Preston were also present and could observe the continued and unnecessary bite of [Plaintiff]."  (*Id.* at 23.)  As for Officer Torres, Plaintiff argues that "prior to the bite, he learned that [Plaintiff] did not have a knife and had not threatened Yolanda" and a "reasonable officer would have radioed this information to Miller and the other officers in the backyard" so that Officer Miller could have "ordered White to remove Toby earlier."  (*Id.*)  As for the second prong of the qualified-immunity analysis, Plaintiff does not identify any case holding that an officer committed a failure-to-intervene violation—let alone a case involving similar facts—and simply contends that, "[g]iven the well-established nature of the duty to intervene in the excessive force context, any reasonable officer would have interceded and provided K-9 warnings or ordered [Plaintiff] out of the shed, from nearer to the shed.  He or she would have also acted to terminate Toby's bite of [Plaintiff].  As to Torres, no particular case was needed to put him on notice of the importance of communicating critical information about the suspect to his fellow officers prior to their use of force."  (*Id.* at 24.)

The remaining Defendants are entitled to summary judgment on Plaintiff's failure-to-intervene claim.  The Court will begin with the second prong of the qualified-immunity analysis because it is straightforward and dispositive.  Recently, the Ninth Circuit reversed a district court's denial of qualified immunity to an officer who was sued under the theory that he failed to intervene when another officer unconstitutionally deployed a canine against an unarmed, non-resisting bystander.  *Penaloza*, 836 F. App'x at 549.  In addition to noting the absence of any case establishing a duty to intervene in that specific factual circumstance, the court more broadly noted that there are no Ninth Circuit decisions, in any context, "clearly establish[ing] when an officer has a 'realistic opportunity to

1    intercede'" and thus held that "the law does not clearly establish when an officer must

2    intervene." *Id.* at 549-50.  Although *Penaloza* is an unpublished decision, its reasoning is

3    sound and establishes that the denial of qualified immunity to the remaining Defendants

4    on Plaintiff's failure-to-intervene claim would be reversible error.

5           Alternatively, even putting *Penaloza* to the side, Plaintiff has not, in his summary

6    judgment briefing, met his burden of identifying a factually analogous case that would have

7    imparted notice to the remaining Defendants that their purported failure to intervene was

8    unconstitutional.  *LSO, Ltd.*, 205 F.3d at 1157.  The one case that Plaintiff cites, *Gates*,

9    involved dissimilar facts and simply recognizes the general principle that police officers

10   sometimes have a duty to intervene.  Much more is required to overcome a claim of

11   qualified immunity.  *Sharp*, 871 F.3d at 910-11.

12          **B.    Integral Participation**

13          For similar reasons, the remaining Defendants are entitled to qualified immunity as

14   to any "integral participation" claim.[39]  Even assuming, as Plaintiff argues (Doc. 76 at 25)

15   and as Defendants dispute (Doc. 69 at 19-21), that the "integral participation doctrine" is a

16   potentially viable theory of liability under Ninth Circuit and Supreme Court law,

17   Defendants make the additional argument that summary judgment is warranted under the

18   second prong of the qualified-immunity analysis: "[A]ll of the involved officers are entitled

19   to qualified immunity because no clearly established law was violated."  (Doc. 69 at 20.)

20   In response, Plaintiff does not directly engage with this argument but cites the following

21   two cases that, generously construed, could be viewed as his attempt to identify the clearly

22   established law supporting his claim: (1) *Boyd v. Benton*, 374 F.3d 773 (9th Cir. 2004); and

23   (2) *Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007).[40]  (Doc. 76 at 24-25.)  In

24   reply, Defendants argue these cases are insufficient because "none . . . address[es] a law

25   enforcement officer's obligation to intervene in a canine deployment, or when their

26   _____

27   [39]    Plaintiff concedes that Sergeant McCarthy is entitled to qualified immunity as to any integral participation claim.  (Doc. 76 at 24 n.3.)

28   [40]    At oral argument, Plaintiff again cited these cases but acknowledged that they involved far different facts than this case.

participation in a law enforcement canine use rises to the level of an individual constitutional violation."  (Doc. 80 at 9.)

Defendants are correct.  In *Boyd*, the plaintiff sued various members of a SWAT team for violating her Fourth Amendment rights during the execution of a search warrant. 374 F.3d at 775-76.  Her specific allegation was "that the use of a 'flash-bang' device constituted excessive force under the circumstances."  *Id.*  The officers who did not deploy the device moved for summary judgment on the ground "that even if a Fourth Amendment violation occurred, only Ellison (the individual who deployed the flash-bang) can be liable for that violation."  *Id.* at 780.  The Ninth Circuit disagreed, holding that "we require[] 'integral participation' by each officer as a predicate to liability . . . [which] does not require that each officer's actions themselves rise to the level of a constitutional violation."  *Id.* The court further held that "[t]he facts of this case clearly support a finding that each officer involved in the search operation was an 'integral participant'" because (1) "the officers in this case stood armed behind Ellison while he reached into the doorway and deployed the flash-bang"; (2) "the use of the flash-bang was part of the search operation in which every officer participated in some meaningful way"; and (3) "every officer was aware of the decision to use the flash-bang, did not object to it, and participated in the search operation knowing the flash-bang was to be deployed."  *Id.*

*Boyd* is insufficient to overcome the remaining Defendants' invocation of qualified immunity because it is so factually dissimilar to this case.  As an initial matter, *Boyd* involved law enforcement officers jointly planning, and then participating in, a search operation utilizing flash-bang devices.  This is obviously far afield from law enforcement officers jointly planning, and then participating in, a search and seizure operation using a canine.  Plaintiff attempts to downplay the significance of these factual differences by characterizing *Boyd* as a case establishing that "the defendant must be a participant in the constitutional violation as opposed to a mere bystander" (Doc. 76 at 24), but this is exactly the sort of abstract generalization that is impermissible under the second prong of the qualified-immunity analysis. *Kisela*, 138 S. Ct. at 1152 ("This Court has repeatedly told

courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.") (internal quotation marks omitted); *Sharp*, 871 F.3d at 910-11 ("The Supreme Court has repeatedly instructed that we examine whether the violative nature of particular conduct is clearly established by controlling precedent, not whether the conduct violates a general principle of law.").

Perhaps more important, Plaintiff's only remaining theory of liability as to Officer Miller does not turn on the initial decision to deploy Toby, but on the "duration and encouragement" of the resulting bite.  It is difficult to see how all of the remaining Defendants could be characterized as integral participants in this particular aspect of the encounter.  At a minimum, this is even further afield from the facts of *Boyd* than the overall plan to use a canine.

This leaves *Blankenhorn*.  There, a group of police officers observed the plaintiff trespassing on the premises of a mall from which he had previously been banned.  485 F.3d at 468.  The plaintiff presented evidence that he was calmly talking with one of the officers when the officer grabbed his arm; that he responded by pulling his arm free; that the officer responded by threatening to spray him with mace; that although he responded with some displeasure (by throwing his driver's license on the ground), he "did not take a combative stance, clench his fists, or otherwise make threatening gestures"; that the officer then told him to kneel down so he could be handcuffed; that he refused; that three officers then abruptly "gang-tackled him" without attempting to handcuff him; that he "struggled for several moments before the officers brought him to the ground" but, once on the ground, "did not attempt to prevent the officers from handcuffing him"; and that despite his non-resistance to the handcuffing attempt, one of the officers then "punched him several times." *Id.* at 478.  In the ensuing § 1983 action, the district court granted summary judgment in the officers' favor on the plaintiff's excessive force claim but the Ninth Circuit reversed. *Id.* at 467.  The court's only mention of the concept of "integral participation" appeared in a footnote.  *Id.* at 482 n.12.  After clarifying that integral participation "does not require that each officer's actions themselves rise to the level of a constitutional violation . . . [but]

does require some fundamental involvement in the conduct that allegedly caused the violation," the court held that two of the officers could not be viewed as integral participants because they "did not participate in any integral way in the arrest" but four other officers (who, respectively, helped handcuff the plaintiff, ordered another officer to use hobble restraints, and jointly tackled the plaintiff) "may be held liable for this particular alleged use of excessive force." *Id.* (citation and internal quotation marks omitted).

*Blankenhorn* is insufficient for similar reasons as *Boyd*.  It involved several officers' joint use of force when tackling and handcuffing a suspect, not whether bystander officers may be held liable under an integral participant theory when a canine officer allegedly allows his police dog to stay on the bite for too long.  At most, then, *Blankenhorn* establishes broad principles about integral-participant liability that are pitched at too high of a level of generality to provide the sort of notice required under the second step of the qualified-immunity analysis.

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment (Doc. 69) is **granted in part and denied in part**.  Plaintiff's only remaining claim is his excessive force claim against Officer Miller predicated on a "duration and encouragement" theory.

Dated this 30th day of June, 2023.

_____
Dominic W. Lanza
United States District Judge

- 50 -