**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Dillon Rock,

               Plaintiff,

v.

N. Cummings, et al.,

               Defendants.

No. CV-20-01837-PHX-DWL

**ORDER**

       In this § 1983 action, Dillon Rock ("Plaintiff") contends that Officer Mike Miller ("Officer Miller") of the Goodyear Police Department used excessive force when he caused a police dog ("Toby") to bite Plaintiff and then allowed the bite to continue for too long. The encounter, which occurred in October 2019, was precipitated by a 911 call in which Officer Miller and other Goodyear Police Department officials were informed—falsely, as it turns out—that Plaintiff had just threatened his mother with a knife. After the police arrived at the scene, Plaintiff—who was, in fact, unarmed—fled into his father's backyard and hid in a shed. After the police tracked Plaintiff to the shed, one officer opened the door while Officer Miller released Toby, who proceeded to bite Plaintiff's arm and drag Plaintiff out of the shed. The bite, which caused Plaintiff to sustain serious injuries that eventually required surgery, continued for 41 seconds until Toby was released. The entire sequence was captured on the officers' body-worn cameras.

       Following discovery, Officer Miller moved for summary judgment, arguing that he was entitled to qualified immunity because no clearly established law existed as of October

2019 that would have placed him on notice that allowing and encouraging a dog bite under the particular factual circumstances of this case was unconstitutional. (Doc. 69.) The Court disagreed in part, concluding that although Officer Miller was entitled to qualified immunity as to his initial decision to release Toby, he was not entitled to qualified immunity as to Plaintiff's "duration and encouragement" claim. The Court cited *Watkins v. City of Oakland, Cal.*, 145 F.3d 1087 (9th Cir. 1998), as the most relevant case supplying the clearly established law as to that claim:

> [T]he plaintiff in *Watkins* was *not* handcuffed, fully surrendered, and in complete control during the dog-bite sequence, yet the Ninth Circuit still held that the officer's conduct violated clearly established law. . . . These are, in substance, the same facts at issue here (at least when the facts are construed in the light most favorable to Plaintiff). Like [the officer] in *Watkins*, Officer Miller did not call off Toby after becoming aware that Toby was engaged in the bite but instead ordered Plaintiff to show his hands. Like the plaintiff in *Watkins*, Plaintiff was unable to comply with this command because of the bite. And as in *Watkins*, Plaintiff was helpless and surrounded by other armed officers—Corporal Cummings drew but did not deploy his taser— during the bite sequence (which lasted for 41 seconds, which is 11 seconds longer than in *Watkins*, and which was approximately the same length as the sequence in *Watkins* even if limited to the 27-second period before Officer Miller gave the verbal command to Officer White to remove Toby). The Court recognizes that the second prong of the qualified-immunity analysis creates a high bar, under which the plaintiff must identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment, but it is difficult to see how *Watkins* could be said to fail that test.

(Doc. 84 at 43-44, cleaned up.)

Plaintiff pursued an interlocutory appeal of this ruling to the Ninth Circuit. (Doc. 87.) In an August 2024 memorandum disposition, the Ninth Circuit unanimously affirmed. *Rock v. Miller*, 2024 WL 3811396 (9th Cir. 2024). In relevant part, the court held:

> We affirm the district court's denial of qualified immunity to Officer Miller, the canine handler, for allowing the dog to bite Rock for forty-one seconds even though Rock was unarmed and not resisting arrest. Our precedent clearly establishes that allowing a canine bite to continue when the plaintiff neither endangers officers nor attempts to flee or resist arrest violates the

Fourth Amendment.  *Watkins*, 145 F.3d at 1090, 1093.

Here, police responded to a 911 call about Rock threatening his father's wife with a knife and damaging property.  Upon arriving at the scene, officers saw Rock run and hide in a shed in the side yard.  Before entering the yard, Officer Miller, unaided by a PA system, twice warned that if Rock did not "make himself known," Miller would send his police dog into the yard to bite him. Rock, who was in a closed shed on the opposite side of the yard, could not discern Miller's words and was unaware of the presence of a police dog. Miller eventually led the way from the gate to the shed.

When he reached the shed, the canine signaled Rock's presence to the officers.  The officers were immediately outside the shed but failed to provide additional warnings about the dog.  Cummings opened the shed door and Miller deployed the canine into the shed.   Miller gave a bite command and praised the dog for biting Rock.  Rock immediately began screaming in pain. The canine dragged Rock out of the shed and onto his stomach, where four officers surrounded Rock.  It was apparent to the officers that Rock was unarmed and that the shed was empty.  Indeed, Miller admitted that Rock had nothing in his hands when he was dragged from the shed.  Defendants allege that Rock was resisting arrest by grabbing the dog's lead but the district court found a genuine issue of fact as to whether Rock was resisting arrest or recoiling from the pain.  The bite lasted forty-one seconds, resulting in serious damage to Rock's arm.

Viewing the evidence in the light most favorable to Rock, Miller allowed the canine to continue biting Rock even though he was unarmed, did not present an immediate threat to the officers or others, and did not resist or actively evade arrest.  *Watkins*, 145 F.3d at 1093 (allowing canine to bite suspect for "excessive duration" violated clearly established law); *Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994) (observing that "excessive force has been used when a deputy sics a canine on a handcuffed arrestee who has fully surrendered and is completely under control").  Officer Miller is thus not entitled to qualified immunity.

*Id.* at *1-2 (citations and footnotes omitted).

In May 2025, following remand from the Ninth Circuit, the case went to trial. During closing argument, Plaintiff's counsel did not request a specific amount of compensatory damages but suggested that an award in the range of $500,000 to $5 million would be reasonable.  Plaintiff's counsel also requested an unspecified amount of punitive damages.

During deliberations, the jury sent out a note stating: "We are hung and not budging at all." (Doc. 172.) However, after the Court provided an *Allen* charge, the jury resumed deliberations and reached a verdict. (Doc. 174.) The jury found that Officer Miller had "violated Dillon Rock's constitutional right to be free from excessive force" but awarded no compensatory damages and only 50 cents in nominal damages. (Doc. 176.) The jury also found that Officer Miller had "acted with malice, oppression, or in reckless disregard of Dillon Rock's constitutional rights," as required to support an award of punitive damages, but then awarded zero dollars in punitive damages. (*Id.*)

These developments provide the backdrop for two post-trial motions now pending before the Court. First, Officer Miller has filed a renewed motion for judgment as a matter of law ("JMOL"). (Doc. 183.) Second, Plaintiff has filed a motion, as the prevailing party, for over $450,00 in attorneys' fees and non-taxable expenses. (Docs. 179, 192.) After the motions became fully briefed, the Court issued a tentative ruling (Doc. 198) and held oral argument (Doc. 200).

For the reasons that follow, Officer Miller's motion is denied and Plaintiff's motion is granted in part and denied in part—Plaintiff is entitled to recover only 10% of his reasonably incurred fees and expenses, or $45,850.82.

I.    Officer Miller's Renewed Motion For JMOL

    A.    **Legal Standard**

Officer Miller seeks relief under Rules 50(b) and 59(e) of the Federal Rules of Civil Procedure. (Doc. 183 at 1.)

Starting with the former, a renewed motion for JMOL under Rule 50(b) "is properly granted if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict. A jury's verdict must be upheld if it is supported by substantial evidence that is adequate to support the jury's findings, even if contrary findings are also possible. Reviewing a renewed motion for JMOL requires scrutiny of the entire evidentiary record, but the court must not weigh the evidence, and instead should simply ask whether the

nonmoving party has presented sufficient evidence to support the jury's conclusion.  In so doing, the court must draw all reasonable inferences in favor of the nonmoving party and disregard all evidence favorable to the moving party that the jury is not required to believe." *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1242-43 (9th Cir. 2014) (cleaned up).[1]  Thus, when evaluating a claim "of qualified immunity as raised in a renewed motion for JMOL, we give significant deference to the jury's verdict and to the nonmoving parties . . . .  We draw all reasonable inferences in the nonmoving party's favor, and we must disregard all evidence favorable to the moving party that the jury is not required to believe. This is a highly deferential standard."  *Estate of Aguirre v. Cnty. of Riverside*, 131 F.4th 702, 706-07 (9th Cir. 2025) (cleaned up).  *See also Morales v. Fry*, 873 F.3d 817, 826 (9th Cir. 2017) (hereinafter, "*Fry*") ("The district court properly denied Officer Rees's renewed motion for judgment as a matter of law on qualified immunity.  Because the jury found in favor of Morales on her excessive force claim against Officer Rees, the district court was required to construe the trial evidence in the light most favorable to Morales in determining whether her rights were clearly established.").

Turning to the latter, Rule 59(e) provides that "[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment."  *Id.* "Although the text of Rule 59(e) does not identify the standard for evaluating such a motion, the view prevailing in the circuits is that motions to alter or amend the judgment are generally appropriate only in four situations: (1) to correct a manifest error of fact or law; (2) to incorporate newly discovered and previously unavailable evidence; (3) to prevent manifest injustice; and (4) to address an intervening change in controlling law."  *Gonzalez v. US Human Rights Network*, 2024 WL 149979, *4 (D. Ariz. 2024) (cleaned up).  *See generally Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111-12 (9th Cir. 2011) (agreeing that these are the "four basic grounds upon which a Rule 59(e) motion may be

---

[1]    A party may file a renewed motion for JMOL under Rule 50(b) only if it previously made a timely motion for JMOL under Rule 50(a).  *Williams v. Gaye*, 895 F.3d 1106, 1135 (9th Cir. 2018) (noting that "a Rule 50(a) motion is . . . a prerequisite for a Rule 50(b) motion").  Officer Miller satisfied that requirement here.

granted"). The Ninth Circuit has emphasized that "amending a judgment after its entry remains an extraordinary remedy which should be used sparingly." *Allstate Ins. Co.*, 634 F.3d at 1111 (cleaned up).

### B. The Parties' Arguments

Officer Miller contends he "is entitled to qualified immunity on the trial record, notwithstanding the jury's verdict and the resulting judgment in Plaintiff's favor." (Doc. 183 at 3-4.) Officer Miller emphasizes two pieces of trial evidence: (1) Plaintiff's testimony that he "has no memory of what occurred between the time canine Toby bit him and brought him out of the shed until the time he was read his *Miranda* rights"; and (2) the testimony of Plaintiff's expert, Ernest Burwell, who conceded that the Goodyear Police Department's written policy on bite duration is constitutionally acceptable, opined that Officer Miller should have removed Toby from the bite within 3-4 seconds, "acknowledged this opinion meant that removing canine Toby from the bite would have left Miller without any control of [Plaintiff] by any of the officers," and "did not testify as to any other point in time that Toby should have been removed prior to the 29 second-mark when Miller instructed Officer White to remove Toby from the bite." (*Id.* at 5-6.) Officer Miller contends that at least in light of these pieces of evidence, this case is sufficiently distinguishable from *Watkins* as to preclude it from serving as "the kind . . . of clearly established law demanded by the U.S. Supreme Court." (*Id.* at 10.) More specifically, as for Plaintiff's trial testimony, Officer Miller contends that because Plaintiff "never testified at trial whether his acts of resistance were because he was in pain, or his desire to avoid an arrest," it follows that the "body worn camera footage as well as undisputed testimony from the Officers in this case actually shows [Plaintiff] actively and physically resisting arrest," which makes this case "materially different" from *Watkins*. (*Id.* at 11-12 & n.6. *See also id.* at 12-13 n.7 ["While it is assumed a dog bite is painful, [Plaintiff] cannot be said to be passively recoiling in response to the bite, and unlike *Watkins*, [Plaintiff] never testified that the pain of the dog bite and resistance against the dog prevented him from complying with the Officers' orders."]; *id.* at 16 ["No reasonable viewing of the body worn camera

footage allows for the conclusion that Rock had 'fully surrendered' as he grabbed Toby's leash and would not let go despite multiple commands."].)  As for Burwell's testimony, Officer Miller argues that *Watkins* does not provide notice to "every reasonable officer . . . [that] he has a constitutional obligation to remove a law enforcement canine from the bite after 3-4 seconds, simply because a reported knife is not seen in the suspect's hands at that moment."  (*Id.* at 10.)  Additionally, Officer Miller more broadly argues that this Court's denial of qualified immunity at summary judgment, and the Ninth Circuit's affirmance of that decision, were both incorrect because *Watkins* does not, for various reasons, qualify as clearly established law: "Nothing in *Watkins* or any other case relied upon by the Ninth Circuit informed—let alone clearly informed—Miller that his actions and decisions were a constitutionally proscribed use of force.  Finally, *Watkins* also fails because the Ninth Circuit concluded only that duration of a canine bite *may* or *could* constitute excessive force under its circumstances; *Watkins* did not *hold* that the canine officer committed a Fourth Amendment violation."  (*Id.* at 14.)  Last, Officer Miller contends he is also entitled to JMOL under the first prong of the qualified immunity analysis, because no reasonable juror could conclude he used excessive force.  (*Id.* at 16-18.)

Plaintiff opposes Officer Miller's motion.  (Doc. 187.)  According to Plaintiff, "[t]he problem with Miller's position is that he relies on his version of the facts.  Nearly every fact Miller discusses in his Section II 'The Trial Facts' is his version of what happened at trial without any basis or citation to the actual record.  Importantly, these facts are not correct and are contrary to the evidence and testimony elicited at trial.  There were no facts decided by the jury in favor of Miller to support the renewed Motion.  To the contrary, it appears the jury concluded that [Plaintiff] was not fighting Toby as claimed by Miller and that Toby, Miller and the officers had control of [Plaintiff] long before Toby was removed.  This was consistent with the testimony elicited at trial and the body worn camera videos that were introduced into evidence."  (*Id.* at 2-3.)  Plaintiff continues: "The testimony and evidence presented at trial was that [Plaintiff] did nothing consistent with fighting Toby and, instead, that he was writhing and screaming in pain and making statements consistent

with anguish 'oww, oww, oww.'  This is clearly on the body worn camera video.  Further, the testimony was that [Plaintiff] never struck Toby or the officers, said anything that would be consistent with aggression or fighting and was being mauled by Toby with multiple officers hands on. . . .  The statements made by Miller at trial also come down to credibility which was certainly challenged at trial.  For example, Miller testified that he could not tell that [Plaintiff] was in pain. The jury was well within their right to discredit Miller's implausible self-serving statements."  (*Id.* at 3.)  Plaintiff also contends that "*Watkins* provided Miller with sufficient notice under the second prong of the qualified immunity analysis" and that although the suspect in *Watkins* was not armed, "the distinction is immaterial.  A reasonable officer in Miller's position would have learned that [Plaintiff] did not have a knife.  More importantly, Miller was aware that [Plaintiff] was unarmed, and under Toby and his control, when he allowed Toby to remain on the bite for an additional 30-35 seconds."  (*Id.* at 4-5.)

In reply, Officer Miller begins by reiterating his view that this Court (and the Ninth Circuit) were wrong at summary judgment to identify *Watkins* as a case that could qualify as clearly established law under the second prong of the qualified immunity analysis: "There was no *holding* [in *Watkins*] that Officer Chew had violated the U.S. Constitution by allowing his law enforcement canine to stay on bite.  Plaintiff's Response simply ignores that *Watkins*—at its core—does not *hold* that the officer's conduct violated the Constitution and, therefore, cannot supply the constitutional law necessary for qualified immunity's second prong."  (Doc. 188 at 2.)  Next, Officer Miller reiterates many of the arguments he previously made at summary judgment (and to the Ninth Circuit) about why *Watkins* should also be viewed as factually distinguishable from this case.  (*Id.* at 2-4.)  Officer Miller also contends, as he did in his motion, that two additional factual bases for distinguishing *Watkins* came out at trial: (1) "Watkins claimed he did not show his hands because he was recoiling in pain, while [Plaintiff] did not remember why he would not give up his right arm or right hand, why he was grabbing Toby's leash, or why he failed to obey commands from the multiple officers on scene"; and (2) "[i]n *Watkins*, the court still

followed the legal requirements of *Mendoza* that a bite could continue until the suspect had 'fully surrendered' and was 'completely under control' of the on-scene officers, whereas Plaintiff's expert testified that Miller's canine should have been taken off-bite after 3-4 seconds and at a time when no officer would have had control of [Plaintiff] if the canine had been taken off-bite at that moment." (*Id.*) Next, Officer Miller argues that *Mendoza* affirmatively establishes his entitlement to qualified immunity: "Although Miller does not bear the burden to identify clearly established law, the facts of this case overlap with *Mendoza*—where qualified immunity was applied." (*Id.* at 5-7.) Officer Miller also cites *Palmer v. Santa Maria Police Dep't*, 834 F. App'x 349 (9th Cir. 2021), as affirmatively supporting his entitlement to qualified immunity and argues that *Koistra v. Cty. of San Diego*, 310 F. Supp. 3d 1066 (S.D. Cal. 2018), and *Rosenbaum v. City of San Jose*, 107 F.4th 919 (9th Cir. 2024), are distinguishable. (*Id.* at 7-9.) Last, Officer Miller reiterates that he is also entitled to JMOL under the first prong of the qualified immunity analysis, because no reasonable juror could conclude he used excessive force. (*Id.* at 10-12.)

C.    **Analysis**

Officer Miller is not entitled to JMOL under Rule 50(b) or shown that the judgment should be altered or amended under Rule 59(e). At bottom, most of Officer Miller's arguments simply reflect his disagreement with the Court's earlier determination, at summary judgment, that *Watkins* could serve as the clearly established law necessary to overcome his invocation of qualified immunity as to Plaintiff's "encouragement and duration" claim. Not only does the Court continue to believe that analysis was correct, but Officer Miller ignores that the Ninth Circuit affirmed that analysis in the course of rejecting his interlocutory appeal. For example, the Ninth Circuit held: "We affirm the district court's denial of qualified immunity to Officer Miller, the canine handler, for allowing the dog to bite Rock for forty-one seconds even though Rock was unarmed and not resisting arrest. Our precedent clearly establishes that allowing a canine bite to continue when the plaintiff neither endangers officers nor attempts to flee or resist arrest violates the Fourth Amendment." *Rock*, 2024 WL 3811396 at *1 (citing *Watkins*, 145 F.3d at 1090, 1093).

1    The Ninth Circuit also held: "Viewing the evidence in the light most favorable to Rock,

2    Miller allowed the canine to continue biting Rock even though he was unarmed, did not

3    present an immediate threat to the officers or others, and did not resist or actively evade

4    arrest." *Id.* at *2 (citing *Watkins*, 145 F.3d at 1093).

5        These passages serve as law of the case, if not the rule of the mandate, so the Court

6    must follow them here. *Herrington v. County of Sonoma*, 12 F.3d 901, 904 (9th Cir. 1993)

7    ("The law of the case doctrine states that the decision of an appellate court on a legal issue

8    must be followed in all subsequent proceedings in the same case. The doctrine is a judicial

9    invention designed to aid in the efficient operation of court affairs. Under the doctrine, a

10   court is generally precluded from reconsidering an issue previously decided by the same

11   court, or a higher court in the identical case.") (cleaned up). For this reason alone, most of

12   Officer Miller's JMOL arguments are non-starters. For example, Officer Miller

13   emphasizes various factual differences between this case and *Watkins*, such as that *Watkins*

14   involved a "silent alarm," whereas this case involved a domestic violence call; that there

15   was no evidence in *Watkins* about whether the suspect was armed, whereas Officer Miller

16   was initially informed that Plaintiff had threatened a family member with a knife; and that

17   the encounter in *Watkins* occurred in a commercial warehouse where the other officers had

18   their firearms drawn, whereas the encounter here occurred in a confined area and the other

19   officers holstered their firearms. (Doc. 188 at 2-4.) But those details were also part of the

20   summary judgment record. The Ninth Circuit's rejection of Officer Miller's interlocutory

21   appeal necessarily demonstrates that those details are not material to the qualified

22   immunity analysis and do not render *Watkins* distinguishable for purposes of the clearly

23   established prong.

24       The only way Officer Miller might be entitled to JMOL on the issue of qualified

25   immunity following trial, after having his request for qualified immunity denied at

26   summary judgment by the Ninth Circuit, is by showing that (1) the trial record contains

27   new evidence that was not part of the summary judgment record; (2) this new evidence

28   would compel a reasonable juror to find a particular fact in his favor, even when all

reasonable inferences are drawn in Plaintiff's favor and even when disregarding all evidence favorable to him that the jurors were not required to believe; and (3) the consideration of this new fact renders this case distinguishable from *Watkins*. *Estate of Aguirre*, 131 F.4th at 706-07; *Fry*, 873 F.3d at 826; *Escriba*, 743 F.3d at 1242-43; *Williams*, 895 F.3d at 1135; *Herrington*, 12 F.3d at 904.  This is a very difficult showing to make. *See generally A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 459 (9th Cir. 2013) ("[U]nlike a motion to dismiss or motion for summary judgment, we must defer to the facts as they were reasonably found by the jury—we do not draw our own inferences from them.  Markgraf downplays the significance of the difference between cases in which a jury has rendered a verdict and those that are still at the motion to dismiss or summary judgment stage . . . [but he] misses the point that courts must deal with the underpinning facts differently once the jury has rendered a verdict. . . .  [W]e do not hold that a court *cannot* conduct an objective qualified immunity analysis after a jury verdict.  Rather, post-verdict, a court must apply the qualified immunity framework to the facts that the jury found . . . .  [O]ur holding will narrow the number of cases in which a defendant who loses at trial will receive qualified immunity . . . .") (citations omitted).

Officer Miller has failed to make the required showing.  The first piece of new evidence on which Officer Miller relies is Plaintiff's testimony, at trial, that he could not remember what happened during the period after Toby bit him.  In Officer Miller's view, this testimony is dispositive because it forecloses Plaintiff from arguing that he was passively recoiling in response to the bite and means the jury was instead required to accept (as Officer Miller argued) that Plaintiff was resisting arrest.

On the one hand, the Court agrees with Officer Miller that *if* the trial record contained evidence that would compel a reasonable juror to find that Plaintiff was resisting arrest rather than passively recoiling in pain, this new fact would change the qualified immunity calculus.  The Ninth Circuit specifically identified the factual dispute over this issue as "material" and as a reason why Officer Miller was not entitled to qualified immunity at summary judgment. *Rock*, 2024 WL 3811396 at *1 (emphasizing that *Watkins*

"establishes that allowing a canine bite to continue when the plaintiff neither endangers officers nor attempts to flee or resist arrest violates the Fourth Amendment" and concluding that although "Defendants allege that Rock was resisting arrest by grabbing the dog's lead," this argument did not provide a basis for granting qualified immunity because "the district court found a genuine issue of fact as to whether Rock was resisting arrest or recoiling from the pain" and the "collateral order doctrine does not provide appellate jurisdiction to review the district court's decision that genuine issues of material fact exist for trial") (citation omitted). *See also id.* at *2 ("Viewing the [summary judgment] evidence in the light most favorable Rock, Miller allowed the canine to continue biting Rock even though he . . . did not resist or actively evade arrest.").

On the other hand, Officer Miller is wrong that a reasonable juror would be compelled to find, in light of Plaintiff's trial testimony (or lack thereof), that Plaintiff was resisting arrest rather than passively recoiling in pain. This argument ignores the body-worn camera footage, which was introduced at trial and clearly depicts the bite sequence. As the Court explained at summary judgment, "[t]he BWC footage, which is difficult to watch, depicts Plaintiff howling in pain throughout the encounter as a canine is latched onto his arm and actively inflicting wounds. . . . Although Plaintiff did not submit a declaration or deposition testimony explaining why he grabbed Toby's lead, the Court disagrees with Defendants' contention during oral argument that this means the fact of Plaintiff's resistance to arrest must be taken as undisputed. . . . Plaintiff successfully created a dispute of fact on that issue by proffering the BWC footage, which a reasonable juror could interpret as contradicting Defendants' resisting-arrest evidence." (Doc. 84 at 41.) For essentially the same reasons, the footage also forecloses Officer Miller's contention that a reasonable juror would be compelled to find, based on the evidence in the trial record, that Plaintiff was resisting arrest rather than passively recoiling in pain. *See, e.g., Fry*, 873 F.3d at 826 ("Because the jury found in favor of Morales on her excessive force claim against Officer Rees, the district court was required to construe the trial evidence in the light most favorable to Morales in determining whether her rights were

clearly established.").

The other piece of new evidence on which Officer Miller relies is the testimony of Plaintiff's expert, Burwell, who confined his opinion to a criticism of Officer Miller's conduct during the first 3-4 seconds of the bite sequence and "acknowledged this opinion meant that removing canine Toby from the bite would have left Miller without any control of [Plaintiff] by any of the officers." (Doc. 183 at 6.) In Officer Miller's view, this testimony is significant because *Watkins* does not clearly establish the unconstitutionality of the conduct that Burwell criticized—to the contrary, Officer Miller argues that *Watkins* holds "that a bite could continue until the suspect had 'fully surrendered' and was 'completely under control' of the on-scene officers." (Doc. 188 at 4.) But it is sheer speculation that the jury accepted Burwell's opinion and relied on that opinion as the foundation for its verdict. Putting aside the fact that Officer Miller devastatingly (at least in the Court's view) impeached Burwell on cross-examination, the jury was instructed that Burwell's "opinion testimony should be judged like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves . . . ." (Doc. 171 at 9.) Accordingly, the jury could have rejected Burwell's opinion as to why Officer Miller's conduct was impermissible but still concluded, for other reasons, that Officer Miller's conduct amounted to excessive force. *Estate of Aguirre*, 131 F.4th at 706-07 ("We draw all reasonable inferences in the nonmoving party's favor, and we must disregard all evidence favorable to the moving party that the jury is not required to believe. This is a highly deferential standard."). For example, the jury could have rationally concluded, based on all of the trial evidence construed in the light most favorable to Plaintiff, that Officer "Miller allowed the canine to continue biting [Plaintiff] even though he was unarmed, did not present an immediate threat to the officers or others, and did not resist or actively evade arrest"—conduct that, per the Ninth Circuit's earlier decision in this case, is clearly unconstitutional under *Watkins*. *Rock*, 2024 WL 3811396 at *2.

Finally, for the same reasons that Officer Miller is not entitled to relief under Rule 50(b) or Rule 59(e) regarding the second prong of the qualified immunity analysis, Officer

1    Miller is not entitled to relief regarding the first prong of the qualified immunity analysis.

2    II.    Plaintiff's Motion For Attorneys' Fees And Non-Taxable Costs

3         A.    **Legal Standard**

4         Under 42 U.S.C. § 1988(b), "[i]n any action or proceeding to enforce a provision of

5    section[] . . . 1983 . . . of this title, . . . the court, in its discretion, may allow the prevailing

6    party, other than the United States, a reasonable attorney's fee as part of the costs." *Id.*

7    Additionally, under § 1988(c), "[i]n awarding an attorney's fee under subsection (b) . . .

8    the court, in its discretion, may include expert fees as part of the attorney's fee." *Id.*

9         "Because a judgment entered upon a verdict for nominal damages is actually

10   enforceable, . . . a plaintiff who wins nominal damages is a prevailing party under § 1988."

11   *Wilcox v. City of Reno*, 42 F.3d 550, 554 (9th Cir. 1994) (citing *Farrar v. Hobby*, 506 U.S.

12   103 (1992)).  However, a litigant's status "as prevailing party does not necessarily entitle

13   them to attorney's fees . . . .  [I]n some circumstances, even a plaintiff who formally

14   'prevails' under § 1988 should receive no attorney's fees at all." *Romberg v. Nichols*, 48

15   F.3d 453, 455 (9th Cir. 1995) (cleaned up).  *See also Benton v. Or. Student Assistance*

16   *Comm'n*, 421 F.3d 901, 904 (9th Cir. 2005) ("A § 1983 plaintiff who receives a nominal

17   damage award is a prevailing party for purposes of § 1988.  That does not, however, mean

18   that such a plaintiff is necessarily entitled to an award of fees.") (cleaned up).  "There are

19   three factors a district court should consider in determining whether a plaintiff succeeded

20   in some way beyond the judgment for nominal damages.  First, the court should consider

21   the difference between the amount recovered and the damages sought, which in most

22   nominal damages cases will disfavor an award of fees.  Second, the court should consider

23   the significance of the legal issue on which the plaintiff claims to have prevailed.  Third,

24   the court should consider whether the plaintiff accomplished some public goal. . . .  [W]here

25   the district court properly has weighed these three factors, the resulting award of attorney's

26   fees is not an abuse of its discretion." *Mahach-Watkins v. Depee*, 593 F.3d 1054, 1059-60

27   (9th Cir. 2010) (cleaned up).

28         …

1      B.      **The Parties' Arguments**

2          Plaintiff "requests $384,890.00 in attorneys' fees for merits work on this case, plus

3   $25,785.00 for fees incurred preparing this Motion, and $7,564.24 in related nontaxable

4   expenses." (Doc. 179 at 1.) As an initial matter, Plaintiff contends he is entitled to recover

5   his fees and costs under § 1988 because he qualifies as the prevailing party in this matter,

6   at least in relation to Officer Miller. (*Id.* at 3-13.)[2] Plaintiff acknowledges that, under

7   *Farrar*, a district court has discretion to "award a low fee or no fee at all where a plaintiff

8   receives only nominal damages and achieves only technical or *de minimis* success." (*Id.*

9   at 5.) However, Plaintiff identifies four subsequent Ninth Circuit cases—*Wilcox*, *Mahach-*

10  *Watkins*, *Morales v. City of San Rafael*, 96 F.3d 359 (9th Cir. 1996) (hereinafter, "*City of*

11  *San Rafael*"), and *Guy v. City of San Diego*, 608 F.3d 582 (9th Cir. 2010)—in which the

12  Ninth Circuit upheld or compelled fee awards in civil rights cases despite the plaintiff only

13  obtaining a small or nominal damage award. (*Id.* at 5-9.) Plaintiff argues that, for similar

14  reasons, the Court should award fees here despite his receipt of only nominal damages.

15  (*Id.*) More specifically, as for the "three indicia of success" that courts should consider

16  when deciding whether to award § 1988 fees in a case resulting in only nominal damages—

17  which are "the extent of relief, the significance of the legal issue on which the plaintiff

18  prevailed, and the public purpose served"—Plaintiff contends the first factor is not

19  disqualifying because he did not ask for a specific amount of compensatory or punitive

20  damages and because he was precluded by the Court's summary judgment ruling from

21  seeking to hold Officer Miller liable for the initial decision to release Toby. (*Id.* at 5, 9.)

22  As for the second factor, Plaintiff argues that "the high degree of force used by Defendant

23  makes the legality of the duration of Toby's bite an important legal issue." (*Id.* at 10.) As

24  for the third factor, Plaintiff argues that it, alone, supports a fee award because this case

25  involves a claim of excessive force and "deterrence and guidance for the police are

---

26  [2]     Plaintiff concedes that he "did not prevail on his claims under 42 U.S.C. § 1983
27  against the passive defendants, Cummings, McCarthy, Preston, Torres and White, based on theories of integral participation and failure to intervene" but asserts that he "has
28  separated the work performed with respect to those theories and is not seeking fees for that time accordingly." (Doc. 179 at 4.)

significant nonmonetary factors that weigh in favor of awarding fees." (*Id.* at 10-11.) Plaintiff also emphasizes Officer Miller's "role as a national police K9 instructor" and contends that "the excessive force and punitive findings against this nationally known K9 handler will resonate across the country. The findings will serve to deter police officers from similar uses of force and will prevent policymakers from implementing policies that would allow for it." (*Id.* at 11.) Plaintiff cites a podcast as evidence that "this is already happening." (*Id.* at 11-12.) Turning to the size of the requested fee award, Plaintiff argues that the hourly rates of his counsel ($450 and $375) and their paralegal ($125) are reasonable (*id.* at 14-16); that his counsel "made appropriate billing judgment reductions of both their merits and fee application work, based on the same careful review of the billing records that is typically conducted prior to sending a bill to a fee-paying client" (*id.* at 16-17); and that his lodestar computation is reasonable as measured by the factors identified in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67 (9th Cir. 1975), most notably because the case "was hard-fought by the City of Goodyear and by an extremely capable and experienced defense lawyer" and because it involved an attempt to sue a police officer for excessive force. (*id.* at 17-22.)

Officer Miller's response begins as follows: "Plaintiff Dillon Rock filed a lawsuit against six different defendants in which he steadfastly sought $6,145,506.62 in damages. Before jury trial commenced, judgment was entered in favor of five of the six defendants; affirmed by the Ninth Circuit. As to the remaining defendant, Officer Miller, this Court recognized his entitlement to qualified immunity for deploying his law enforcement canine based on the threat Miller reasonably believed [Plaintiff] posed. After five years of litigation, a trip to the Ninth Circuit, and a pending presentation to the U.S. Supreme Court, Plaintiff recovered nominal damages of .50 cents, a sum that represents a .00000814% recovery from the damages disclosed, and a range of .0001% to .00001% from what was requested of the jury at trial . . . ." (Doc. 190 at 1-2.) Officer Miller thus argues that although Plaintiff technically qualifies as the prevailing party, the Court should exercise its discretion to decline to award fees under *Farrar*. (*Id.* at 2-17.) After offering an extensive

discussion of *Farrar* (*id.* at 2-6), Officer Miller argues this case is similar to two cases—*Romberg* and *Benton*—in which the Ninth Circuit rejected a fee request made by a civil rights plaintiff who only obtained nominal damages.  (*Id.* at 6-10.)  Officer Miller also contends, in relation to the first factor, that the cases cited by Plaintiff are distinguishable because "[u]nlike other plaintiffs, Rock cannot argue that the fact that he only recovered nominal damages is irrelevant because he only sought to recover nominal damages from the get-go.  The opposite is true."  (*Id.* at 10.)  In support, Officer Miller provides a copy of Plaintiff's initial Rule 26(a) disclosure, in which Plaintiff did not request nominal damages but requested $145,506.62 in past medical expenses, an unidentified sum for future medical expenses, $3 million in general damages, and $3 million in punitive damages, for a total damage claim of $6,145,506.62.  (*Id.* at 10.)  As for the second factor, Officer Miller contends this factor is a mixed bag because Plaintiff "failed on the most central claim he was asserting; namely, that Officer Miller should not have deployed his law enforcement canine at all."  (*Id.* at 11-12.)  Officer Miller also contends that his conduct was consistent with the Goodyear Police Department's written policy.  (*Id.* at 12-13.)  In any event, Officer Miller contends that Plaintiff's victory was not significant because "there is no evidence that the Goodyear Policy will (or should) change, that Officer Miller's practices will (or should) change, or that the canine handling community at large will subscribe to Plaintiff's" theory of liability.  (*Id.* at 13-14.)  As for the third factor, Officer Miller argues it does not support a fee award for essentially the same reasons that the other factors do not support a fee award—because "Rock did not obtain injunctive relief, or other forms of actual relief," because "Rock was not successful in obtaining judgment proving an overarching municipal policy was, in itself, unconstitutional," because "Rock was not out to get nominal damages from the start of litigation," and because "somebody talking about a case in a podcast or news article does nothing to achieve a tangible result."  (*Id.* at 14-15.)  Officer Miller also contends that if Plaintiff is not entitled to recover his fees, he is not entitled to recover his costs.  (*Id.* at 16-17.)  Finally, turning to the size of the requested award, Officer Miller (1) objects to the $37,800 in fees attributable to one of

Plaintiff's attorneys, because that attorney is not licensed in Arizona, made no court appearances, and performed duplicative work (*id.* at 17-18); (2) objects to the imposition of any fees related to his unsuccessful interlocutory appeal, because Plaintiff could have filed a separate application for those fees with the Ninth Circuit (*id.* at 19); (3) argues that the overall number of hours billed by Plaintiff's lead counsel (822.5 hours) was excessive, because this case was not novel or complex (*id.*); (4) argues that any fee should be drastically reduced to account for the discrepancy between the amount sought by Plaintiff and the amount ultimately obtained (*id.* at 20); and (5) argues that the contingent nature of Plaintiff's fee agreement supports an award of no fees (*id.* at 21).

In reply, Plaintiff begins by requesting an additional $39,150 in fees and $1,119 in nontaxable expenses associated with work performed since the motion was filed. (Doc. 192 at 1.) As for the first factor, Plaintiff argues that Officer Miller unduly emphasizes it, that his Rule 26(a) disclosures do not provide a proper benchmark, and that his counsel's reference during closing argument to a $500,000 to $5 million range of compensatory damages was "in the form of a hypothetical." (*Id.* at 1-2.) For similar reasons, Plaintiff contends that Officer Miller's cited cases are distinguishable, because the plaintiffs' complaints in those cases (unlike his complaint in this case) sought a specific sum of damages. (*Id.* at 2.) As for the second factor, Plaintiff disputes that his challenge to the initial decision to deploy Toby was his "central" claim; argues that some of Officer Miller's other arguments are irrelevant; contends that *Benton* is distinguishable because "the denial of fees [in that case] concerned the revision of an Oregon statute"; and cites *Mahach-Watkins* for the proposition that when a case involves a claim of severe excessive force, it necessarily raises a significant legal issue. (*Id.* at 2-5.) Plaintiff also cites *Fry* as an additional Ninth Circuit case supporting his fee request. (*Id.* at 4-6.) As for the third factor, Plaintiff reiterates his contention that *Guy*, *City of San Rafael*, *Mahach-Watkins,* and *Wilcox* support awarding fees in civil rights cases involving claims of excessive force. (*Id.* at 5-6.) Plaintiff also contends that Officer Miller's refusal to admit fault or change his practices in response to the verdict amplifies the need for a fee award. (*Id.* at 6.) Finally,

as for the size of the fee award, Plaintiff argues that the challenged attorney was, in fact, licensed in Arizona at all relevant times and that Officer Miller has failed to establish that any of that attorney's work was duplicative (*id.* at 7); that his failure to seek fees from the Ninth Circuit should not result in forfeiture because (a) the Ninth Circuit could have simply transferred any fee request to this Court and (b) he was not a prevailing party at the time of the Ninth Circuit's decision (*id.* at 7-8); that he is entitled to recover the fees spent litigating over fees (*id.* at 9); and that the *Kerr* factors support a full lodestar award (*id.* at 9-11). "In total, Plaintiff seeks $449,825.00 in fees and $8,683.24 in expenses." (*Id.* at 11.)

C.    **Analysis**

As noted, "[t]here are three factors a district court should consider" when deciding whether to award attorneys' fees under § 1988 to a civil rights plaintiff who only obtained an award of nominal damages. *Mahach-Watkins*, 593 F.3d at 1059. "First, the court should consider the difference between the amount recovered and the damages sought, which in most nominal damages cases will disfavor an award of fees. Second, the court should consider the significance of the legal issue on which the plaintiff claims to have prevailed. Third, the court should consider whether the plaintiff accomplished some public goal." *Id.* (cleaned up).

The first factor—the difference between the amount recovered and the damages sought—strongly counsels against a fee award here. Plaintiff indicated via his pretrial disclosures that he was seeking more than $6 million in damages (Doc. 190-1 at 2) and then stated, during closing argument, that the jury would be justified in awarding up to $5 million in compensatory damages, even before awarding an unspecified additional amount of punitive damages. The resulting verdict of 50 cents in nominal damages obviously came nowhere close to these requests.

In his motion papers, Plaintiff seeks to distance himself from his own damage-related demands by emphasizing that his complaint did not seek a specific amount of damages and that his counsel's discussion of damages during closing argument was

phrased in the form of a "hypothetical" bracket.[3]  The Court cannot see how these details make any difference.[4]  The bottom line is that Plaintiff's objective in this action was always to obtain a large damage award.  He failed at achieving that objective.

The Ninth Circuit has held that a fee request under § 1988 should "usually" be disallowed when, as here, the first factor is resolved in the defendant's favor.  *See, e.g.*, *Mahach-Watkins*, 593 F.3d at 1059 ("[W]hen a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief, the only reasonable fee is usually no fee at all.") (citation omitted); *Benton*, 421 F.3d at 905 (same); *Romberg*, 48 F.3d at 455 ("[T]he Rombergs are a perfect example of plaintiffs who should receive no attorney's fees at all.  As in *Farrar*, the Rombergs requested a substantial sum, but received only one dollar each; although they prevailed, the Rombergs did not succeed.") (cleaned up).  *See also Guy*, 608 F.3d at 589 ("The jury awarded no compensatory damages, and this lack of damages normally would weigh against a fee award.").  In a related vein, the Ninth Circuit has held that an award of nominal damages is a "strong indication" that a § 1983 lawsuit achieved a low degree of success, at least when, as here, the plaintiff unsuccessfully sought actual damages.  *Wilcox*, 42 F.3d at 554-

---

[3]    Plaintiff's counsel stated: "The next thing you're going to be able to decide are the damages he's entitled to.  And I don't know what the right amount is.  I don't know if it's 500,000 or five million.  I really don't know.  There's no precise number you guys can discuss it.  Can I tell you this: Once you guys decide the damages for him, those are the damages that he gets for the rest of his life, no matter what complications he has, no matter what difficulties arise.  No matter if he's able to pursue his hobbies or not and he can't come back to court."

[4]    In *Mahach-Watkins*, the Ninth Circuit observed that "[t]he case now before us is not on all fours with *Romberg*" because the *Romberg* "plaintiffs' problem was that their evidence did not support their damages claim for $2 million dollars" whereas "Mahach-Watkins did not seek a specified amount of damages" and "sought only an award of compensatory damages 'according to proof at trial.'"  *Mahach-Watkins*, 593 F.3d at 1061.  The court does not construe that observation as a holding that a plaintiff can avoid being seen as requesting damages, for purposes of the first factor, simply by making an unquantified request for damages in the complaint and then speaking in hypotheticals during closing argument.  Such a rule would defy common sense.  Moreover, the court in *Mahach-Watkins* went on to clarify that the more "important[]" distinction from *Romberg* was that "the district court determined that evidence of actual harm was irrelevant to Mahach-Watkins's § 1983 claim, instructing the jury as a matter of law that she was entitled to nominal rather than compensatory damages."  *Id.*  No such instruction was given here.  Thus, whereas the plaintiff's failure to obtain a damage award merely "somewhat disfavor[ed] an award of attorney's fees" under the unique facts of *Mahach-Watkins*, 593 F.3d at 1061, it more strongly disfavors an award of fees here.

55 ("When the sole purpose of a civil rights claim is the recovery of money damages, a failure to obtain a judgment awarding actual damages is a strong indication of a low degree of success . . . .  Thus, if a lawsuit achieves nothing other than an award of nominal damages, the prevailing party might deserve to receive no attorney's fees at all.") (cleaned up).  Nevertheless, the first factor is not dispositive.  As Plaintiff notes, the Ninth Circuit has upheld (or even compelled) fee awards in several § 1983 cases in which the plaintiff unsuccessfully sought an award of actual damages and ended up receiving only nominal damages.  It is therefore necessary to examine those cases and evaluate how their assessment of the second and third factors maps onto the facts of this case.

The first case on which Plaintiff relies is *Wilcox*.  There, the plaintiff brought a *Monell* claim against the City of Reno after a police officer punched him in the face during an arrest.  *Wilcox*, 42 F.3d at 551.  After the plaintiff filed suit, the City of Reno disciplined the officer and then issued a written directive that prohibited closed-fist strikes to the face, using the videotape of the incident "as a training tool to show . . . officers exactly what type of force the new policy no longer allowed."  *Id.* at 552-53.  The trial resulted in a finding that "the Reno Police Department had a policy that resulted in the use of excessive force, and that this policy proximately caused [the plaintiff's] injuries," yet despite the plaintiff's "claims of continuing headaches and abiding pain in one ear, the jury awarded [him] one dollar in damages."  *Id.* at 553.  The district court granted the plaintiff's request for § 1988 fees despite this award, albeit in "a sum equal to only sixty percent of the amount requested," and the Ninth Circuit affirmed.  *Id.* at 555.  Without expressly referencing the second and third factors, the court held that "[i]f a district court chooses to award fees after a judgment for only nominal damages, it must point to some way in which the litigation succeeded, *in addition* to obtaining a judgment for nominal damage.  If the lawsuit achieved other tangible results—such as sparking a change in policy or establishing a finding of fact with potential collateral estoppel effects—such results will, in combination with an enforceable judgment for a nominal sum, support an award of fees."  *Id*.  The Ninth Circuit held that this standard was satisfied because "[t]his lawsuit achieved admirable

results.  The jury determined a city policy to be unconstitutional, and further determined that the policy caused injury to Wilcox.  During the course of the litigation, the city disciplined officer Tivis, whose misconduct may not have come to light but for the initiation of this lawsuit.  Also during the course of litigation, the City modified its use of force policy.  The litigation likely precipitated both the disciplining of Tivis and the change in policy.  The judgment that the prior policy was unconstitutional will benefit the City and its residents by preventing the police department from reverting to its old policy or a similar policy some time in the future."  *Id.* at 556-57.

This case is distinguishable from *Wilcox* for the obvious reason that Plaintiff's filing of this lawsuit, and the jury's liability finding against Officer Miller, do not appear to have had any effect whatsoever on the Goodyear Police Department or Officer Miller.  At trial, the defense represented, while attempting to introduce Exhibit 108, that Officer Miller was cleared of any wrongdoing by the Goodyear Police Department following a use-of-force investigation, which determined that his use of force was "within policy."  Nor is there any evidence that the Goodyear Police Department has changed its use-of-force policy generally, or its use-of-canine policy specifically, as a result of the verdict or that Officer Miller has changed the way he trains other canine handlers as a result of the verdict.  To the contrary, Officer Miller appears to be steadfast in his belief that he did nothing wrong, that the verdict in this case is unfounded and will be reversed on appeal, and that he is justified in continuing to follow the same practices he followed before his encounter with Plaintiff.  (Doc. 190 at 13 ["That Plaintiff was able to convince a jury that Officer Miller should have rejected his own Department's constitutionally compliant policy, disengaged the bite at a time when no person controlled Rock, and by doing so place himself, his fellow officers, and even Mr. Rock, in a greater position of danger, is hardly a 'win' on any significant legal issue.  Additionally, there is no evidence that the Goodyear Policy will (or should) change, that Officer Miller's practices will (or should) change, or that the canine handling community at large will subscribe to Plaintiff's suggestion that canine's [sic] who are lawfully deployed be removed from the bite before the suspect has 'fully surrendered'

or is under 'complete control,' as is currently recognized by all Ninth Circuit decisions dealing with the issue of reasonableness of duration of bite."].)  Accordingly, this case has not "spark[ed] a change in policy or establish[ed] a finding of fact with potential collateral estoppel effects" in the same manner that justified a fee award in *Wilcox*.

The second case on which Plaintiff relies is *City of San Rafael*.  There, the plaintiff sued the City of San Rafael, as well as an individual police officer, for arresting him without probable cause.  *City of San Rafael*, 96 F.3d at 360.  At trial, the plaintiff requested compensatory damages ranging from $150,000 to $250,000 but the jury awarded only $17,500, with the individual officer found liable based on the plaintiff's § 1983 claim and the City of San Rafael found liable based on a state-law claim.  *Id.* at 360-61, 363 n.5.  Post-trial, the plaintiff sought nearly $140,000 in attorneys' fees under § 1988 but the district court awarded only $20,000, concluding that a reduction was necessitated under *Farrar* because the plaintiff received only "a relatively small portion of the damages" sought.  *Id.* at 361-62.  The Ninth Circuit reversed, holding that the district court was wrong to apply *Farrar* because it only applies in cases involving true nominal damage awards.  *Id.* at 363 ("Morales' damages award of $17,500 in compensatory damages, while substantially less than what he sought, was not nominal.  Because the *Farrar* exception is inapplicable to cases in which the damages are not nominal, the district court erred in invoking it here.").  The court then went on to hold that "even if Morales' damages award were nominal, the *Farrar* exception would not be applicable here" because "Morales' nonmonetary success was significant.  The jury held both the City and the officer involved responsible for his unlawful arrest.  *Because it assessed damages against the defendants, the verdict established a deterrent* to the City, its law enforcement officials and others who establish and implement official policies governing arrests of citizens.  Thus, it served the public purpose of helping to protect Morales and persons like him from being subjected to similar unlawful treatment in the future."  *Id.* at 363-64 (emphasis added).

Although the lawsuit and verdict in *City of San Rafael* (unlike the lawsuit and verdict in *Wilcox*) apparently did not prompt the municipal defendant to undertake any tangible

corrective actions, such as disciplining the officer involved in the incident or changing its written policy, the verdict in *City of San Rafael* did result in a finding that the municipal defendant (and not just the individual officer) had engaged in wrongdoing and was responsible for the plaintiff's mistreatment. Additionally, the district court in *City of San Rafael* "made an explicit finding in its fee-setting order that Morales' litigation served a significant public policy interest, stating that the verdict 'constitutes a warning to law-enforcement officers not to treat civilians unconstitutionally,'" and the verdict in *City of San Rafael* was accompanied by a non-nominal award of damages. *Id.* at 364-65. As the italicized text in the preceding paragraph indicates, the *City of San Rafael* court held that this combination of factors created a "deterrent" effect that qualified as significant nonmonetary success under *Farrar*.[5] But the same combination of factors is not present here. Not only was there no finding of municipal liability, and not only is the Court skeptical that the verdict will serve as a significant warning to other law enforcement agencies or officers—as evidenced by Officer Miller's and the Goodyear Police Department's reaction to the verdict—but, most important, there was no award of actual damages.

The third case on which Plaintiff relies is *Mahach-Watkins*. There, after a man was fatally shot during a struggle with a police officer, his mother (on behalf of his estate) asserted a § 1983 claim against the officer and also asserted (on her own behalf) a state-law claim against the officer. *Mahach-Watkins*, 593 F.3d at 1056-57. The trial was bifurcated and, after the jury returned liability verdicts as to both claims, "the district court instructed the jury that it could return an award of only one dollar in nominal damages on the § 1983 claim, irrespective of what the evidence showed. The court instructed the jury

---

[5] The Court notes that it is difficult to envision a scenario in which this rule would have any practical application. As the first portion of *City of San Rafael* clarifies, *Farrar* only applies in cases involving awards of nominal damages (and not in cases of lower-than-expected-but-not-nominal damages). But that means there will never be reason to consider, under *Farrar*, whether a liability verdict coupled with "assessed damages against the defendants" will result in a "deterrent" effect that qualifies as significant nonmonetary success—if there are "assessed damages," there is no reason to go down the path of applying *Farrar*.

that it could return an award on the wrongful death claim in whatever amount the evidence supported.  At the conclusion of the damages phase, the jury awarded one dollar in nominal damages on each of the two claims."  *Id.* at 1057.  Post-trial, the plaintiff sought nearly $700,000 in attorneys' fees under § 1988 while the officer argued that the request should be categorically denied under *Farrar* in light of the nominal damages award.  *Id.* at 1058.  The district court disagreed with both sides, awarding $136,687.35 in fees, and the Ninth Circuit affirmed.  As for the first factor, the court held that although an award of nominal damages might cut against awarding any § 1988 fees in a case (like *Romberg*) where the jury could have awarded compensatory damages on the § 1983 claim and declined to do so, that principle was "not on all fours" because the district court instructed the jury that it was foreclosed from awarding anything other than nominal damages on the § 1983 claim.  *Id.* at 1060-61.  The court thus held that "[i]n the circumstances of this case, [the first] factor *somewhat* disfavors an award of attorney's fees."  *Id.* at 1061 (emphasis added).  As for the second factor, the court held that it "supports the award of attorney's fees" because "[w]e have difficulty imagining a more important issue than the legality of state-sanctioned force resulting in death."  *Id.* at 1061-62.  As for the third factor, the officer argued that the lawsuit failed to accomplish any public goal because, unlike in *Wilcox*, he was cleared of wrongdoing following an internal investigation and his police department declined to change its use-of-force policies in the wake of the incident.  *Id.* at 1062.  The court disagreed, holding that "[w]e are unwilling to conclude that no public goal was served by Mahach-Watkins's § 1983 verdict merely because the CHP disagreed with the jury's conclusion that its officer used excessive force in violation of the Fourth Amendment, and because the CHP has refused either to discipline the officer or to change its policies."  *Id.* The court further held that "[t]he verdict had the deterrent effect we described in [*City of San Rafael*]."  *Id.* at 1063.[6]  The court thus concluded that although "[t]he jury did not give

---

[6]    As discussed in earlier portions of this order, *City of San Rafael* held that the jury verdict in that case had a deterrent effect because it was coupled not only with an explicit finding by the district court that it would serve as a warning, but also with a damage award: "*Because it assessed damages against the defendants*, the verdict established a deterrent to the City, its law enforcement officials and others who establish and implement official policies governing arrests of citizens."  *City of San Rafael*, 96 F.3d at 364 (emphasis

1    Mahach-Watkins everything she asked for, . . . it gave her enough to entitle her to an award

2    of attorney's fees under § 1988." *Id.*  Finally, the court rejected the plaintiff's challenge to

3    the district court's decision to reduce her fee request, concluding that the reduction was not

4    an abuse of discretion.  *Id.*

5         Although this case is similar to *Mahach-Watkins* in two relevant respects—first, it

6    was an excessive force case that resulted in an award of only nominal damages against an

7    individual officer, and second, the lawsuit and verdict did not prompt the officer or the

8    municipality to make any changes to their policies or prospective conduct—it is also

9    distinguishable from *Mahach-Watkins* in two relevant respects.  First, whereas the first

10   factor only "somewhat" disfavored a fee award in *Mahach-Watkins* in light of the jury

11   instruction that forbade the jury from awarding actual damages on the § 1983 claim, no

12   such instruction was given in this case.  The Court thus views the first factor as more

13   strongly counseling against a fee award here.  Second, whereas the second factor strongly

14   favored a fee award in *Mahach-Watkins* because that case involved the use of lethal force,

15   this case involves the use of non-lethal force.  The Court thus views the second factor as

16   less strongly favoring a fee award here.

17        The fourth case on which Plaintiff relies is *Fry*.  There, the plaintiff was attending a

18   protest in Seattle when she was "yanked . . . headlong over [a] bike" onto the ground by

19   Officer Fry and then pepper-sprayed in the eyes by Officer Rees when she tried to stand

20   up.  *Fry*, 873 F.3d at 820.  "The jury could have believed that, having recognized [the

21   plaintiff] from [an] earlier encounter, Rees intentionally pepper-sprayed her in retaliation

22   for her earlier rudeness, and then claimed that he discharged his pepper spray accidentally."

23

24   added).  It is therefore unclear why *Mahach-Watkins* held that the verdict in that case,
     which resulted in only nominal damages, would have the same deterrent effect: "[T]he
25   verdict had the deterrent effect we described in [*City of San Rafael*]: '[T]he verdict
     established a deterrent to . . . others who establish and implement official policies
26   governing arrests of citizens."  *Mahach-Watkins*, 593 F.3d at 1063.  Indeed, *Mahach-Watkins* omitted, from its quotation of *City of San Rafael*, the qualifying phrase "[b]ecause
27   it assessed damages against the defendants."  At any rate, it is not this Court's role to
     second-guess whether *Mahach-Watkins* was correctly decided.  *Hasbrouck v. Texaco, Inc.*,
28   663 F.2d 930, 933 (9th Cir. 1981) ("District courts are bound by the law of their own circuit
     . . . no matter how egregiously in error they may feel their own circuit to be.").

- 26 -

*Id.* at 826. The plaintiff "brought suit against the City of Seattle and several of the officers involved, making unlawful arrest and excessive force claims against Officer Fry and an excessive force claim against Officer Rees." *Id.* at 820. "The jury found for [the plaintiff] on her excessive force claim against Rees, but not on her unlawful arrest and excessive force claims against Fry." *Id.* Additionally, the plaintiff had sought "approximately $62,500 . . . on her excessive force claim against Officer Rees" but the jury awarded $0 in damages, which the parties later stipulated should be an award of $1 in nominal damages. *Id.* at 820, 827. Post-trial, the plaintiff sought $298,762 in attorneys' fees and the district court awarded $165,405, which reduced sum represented "the reasonable number of hours needed to secure [the plaintiff's] victory on her excessive force claim, . . . reduced . . . by one-third to one-half to generate the lodestar amount." *Id.* at 828. Officer Rees appealed this award, arguing that the plaintiff "should only be awarded $6,494.83 because she only prevailed on 1 of the 46 claims in her original complaint," but the Ninth Circuit rejected this as an "unreasonable metric" and affirmed the award of $165,405. *Id.* at 827-28. As for the first factor, the court held that it "weighed against" the plaintiff but "was not dispositive, since otherwise attorney's fees would never be awarded in nominal damages cases." *Id.* at 827. The court also emphasized that the first factor did not weigh as heavily against the plaintiff as in some other nominal-damages cases, such as *Farrar* and *Romberg*, because the plaintiffs in those cases unsuccessfully sought multi-million-dollar awards whereas "the difference between the damages sought and those awarded here is less dramatic." *Id.* As for the second factor, the court held that because the use of pepper spray qualifies as "intermediate force" that presents a significant intrusion upon an individual's liberty interests, it "constitutes a significant legal issue" that may support an award of fees. *Id.* at 827-28. With that said, the court acknowledged that such force "is not as legally significant as an officer's use of deadly force." *Id.* at 827. As for the third factor, the court held that it supported an award of fees, even though "there is no evidence that Rees or the Seattle Police Department voluntarily admitted fault at any point in the proceedings, or that the Seattle Police Department has modified its policies on pepper spray," because the

district court found that "the jury's excessive force finding put police officers on notice that intentionally pepper spraying unarmed, already-restrained but mildly-resistant suspects, even in loud and chaotic protest situations violated clearly established law, and it was likely that in light of the heightened civil protests this past year the police will find themselves in strikingly similar situations." *Id.* at 828 & n.9 (cleaned up).

On the one hand, this case and *Fry* each involved an excessive-force claim against an individual officer for using non-deadly force, each case resulted in nominal-damage verdict, and each verdict failed to prompt the officer or the police department to undertake any corrective action. It is therefore understandable why Plaintiff would view *Fry* as a helpful precedent. On the other hand, this case is distinguishable from *Fry* in two respects that are unfavorable to Plaintiff. First, whereas the plaintiff in *Fry* only sought a modest sum of compensatory damages ($62,500), here Plaintiff sought a multi-million-dollar award. *Fry* specifically identified this as a reason why the first factor did not undermine the plaintiff's fee request as drastically as in cases involving unsuccessful requests for multi-million-dollar awards. Second, whereas the district court in *Fry* found that the verdict was likely to have a deterrent effect on other police departments, given the likelihood that "strikingly similar situations" would recur during future civil rights protests, the Court is skeptical that the same is true here.

The fifth case on which Plaintiff relies is *Guy*. There, a § 1983 plaintiff asserted excessive force claims against an array of individual law enforcement officers, seeking $125,000 in compensatory damages as well as punitive damages, but ultimately obtained a verdict that found only one officer liable and awarded only nominal damages. *Guy*, 608 F.3d at 585, 590.[7] The plaintiff was dissatisfied with the lack of a damage award. *Id.* at 586 ("Guy urges that we remand for a new trial on damages because the jury's verdict was not supported by substantial evidence."). The plaintiff also failed to present any "evidence

---

[7] Although the Ninth Circuit's decision does not identify the amount of compensatory damages the plaintiff sought, that figure can be found in the underlying decision by the district court. *Guy v. San Diego*, 2008 WL 2037767, *4 (S.D. Cal. 2008) ("Plaintiff sought compensatory damages of about $125,000 and received only $1.").

that the [police department] changed its investigation procedures or modified its use-of-force policies because of this case" or any "specific evidence that the [police department was] watching [the offending officer] more closely as a result of this case." *Id.* at 590. The district court denied the plaintiff's request for § 1988 fees but the Ninth Circuit reversed, concluding "that the district court abused its discretion in completely rejecting Guy's request." *Id.* The court elaborated:

> The jury verdict that some of [the officer's] force was excessive offers clear and important guidance to the police department, which is a sufficiently tangible result. *See* [*City of San Rafael*], 96 F.3d at 363-64.[8] The [police department] now knows, if it did not know before when it conducted its internal review, that even if [the officer's] force was initially justified, if it went too far, i.e., if he harmed Guy unnecessarily or gratuitously after Guy had been subdued, then a jury may determine that force was excessive. We are therefore not prepared to say that the jury verdict produced no tangible results. It is logical to expect, in the face of this jury verdict, that the police department would take a closer look at the level of force used by its police officers after they have subdued a suspect. Such a result, under the circumstances of this case, would justify some amount of costs and attorney fees. Of course, in determining the amount of such an award, the trial court may consider, among other things, Guy's limited success in obtaining only nominal monetary damages. We remand to the district court for a determination of the amount of costs and attorney's fees to be awarded.

*Id.* (citations omitted).

Of all of Plaintiff's cited cases, *Guy* most strongly supports Plaintiff's fee request. In both cases, a § 1983 plaintiff asserted non-lethal excessive force claims against an array of officers, ultimately prevailed against only one officer, was allowed (unlike in *Mahach-Watkins*) to seek full compensatory damages against that officer, sought a substantial damages award but only received an award of nominal damages, was dissatisfied with the nominal damage award,[9] and failed to present evidence that the lawsuit and verdict resulted

---

[8]    As discussed in previous footnotes, the Court is skeptical that *City of San Rafael* should be construed as standing for the proposition that a liability verdict in a § 1983 action, unaccompanied by a damage award, necessarily results in a deterrent effect.

[9]    As noted, the plaintiff in *Guy* sought a new trial on damages, unsuccessfully arguing that the nominal damage award was irreconcilable with the liability verdict and trial evidence. *Guy*, 608 F.3d at 586-88. Here, similarly, Plaintiff seems to contend that the

1    in any tangible changes to the officer's conduct or the police department's policies.  Under

2    those circumstances, the Ninth Circuit held that the district court was legally required to

3    grant some portion of the plaintiff's fee request under § 1988 and abused its discretion by

4    categorically denying the request.  Although the Court will confess that it views this

5    outcome as difficult to reconcile with the notion that a lack of success on the first factor

6    should "usually" result in the denial of fees, *Mahach-Watkins*, 593 F.3d at 1059—indeed,

7    the logic of *Guy* would seem to compel an award of § 1988 fees whenever there is a finding

8    of non-lethal excessive force against an individual officer that results in an award of

9    nominal damages, regardless of whether the officer or the police department make tangible

10    changes in response to the lawsuit and verdict—the Court is required to follow *Guy*.

11    *Hasbrouck*, 663 F.2d at 933.  And per *Guy*'s logic, although the first factor cuts against a

12    fee award here, the second and third factors support an award and the three factors on

13    balance support an award.

14        Officer Miller's counterarguments and cited authorities do not compel a different

15    conclusion.  Officer Miller's brief contains very little discussion of *Guy*, which he seeks to

16    distinguish as a narrow decision that simply compelled a fee award "[u]nder the specific

17    facts present in the *Guy* case."  (Doc. 190 at 14.)  The problem with this approach is that

18    the facts of this case are, in nearly all material respects, indistinguishable.  In the Court's

19    view, the only two relevant differences are that (1) the amount of compensatory damages

20    sought in *Guy* ($125,000), although much higher than the amount sought in *Fry* ($62,500),

21    still paled in comparison to the multi-million-dollar award that Plaintiff sought here; and

22    (2) the jury here made a finding of punitive-damage liability, albeit without awarding

23    punitive damages, which suggests that the jury was particularly alarmed by Officer Miller's

24    conduct.  The first distinction tends to weigh against awarding fees, while the second

25

26    _____

27    nominal damage award was the result of alleged evidentiary errors by the Court.  (Doc.
      179 at 11 ["Over Plaintiff's objection, . . . the jury heard about no fewer than three other
      subsequent domestic altercations involving Plaintiff.   This was allowed in because
      Defendant argued it impeached the credibility of Plaintiff's testimony on damages. . . .

28    Despite the jury being poisoned against Plaintiff by this unsavory evidence, it still sent a
      clear message to Defendant that the duration of Toby's bite was unacceptable."].)

distinction tends to weigh in favor of awarding fees, and the two distinctions in combination do not serve to sufficiently distinguish this case from *Guy* as to justify the outright denial of fees.

Officer Miller also identifies *Benton* and *Romberg* as his best two Ninth Circuit authorities supporting the denial of fees, but neither case involved an excessive force claim. *Benton*, 421 F.3d at 902-03 ("Plaintiff alleged seven claims for violation of the federal and state constitutional rights to free speech, free exercise of religion, due process and equal protection.  These claims were predicated upon allegations that the Oregon Office of Degree Authorization had decreed that plaintiff should be fired from her position at the college because her degree was 'illegal' or face criminal sanctions and then later decreed that plaintiff need not be fired but must give a disclaimer regarding her degrees."); *Romberg*, 48 F.3d at 454 ("The Rombergs alleged, among other things, that the deputies had violated their constitutional rights by not obtaining a search warrant before entering their home in response to a call about a domestic disturbance in 1982.").  Additionally, in *Benton*, there were unique, case-specific reasons—which are not present here—to conclude that the verdict had no deterrent effect.  *Benton*, 421 F.3d at 907-08 ("[W]ell prior to the district court's finding of a constitutional violation and award of nominal damages, defendant Contreras exercised his discretion under [a revised Oregon statute] in plaintiff's favor by recognizing her degree as being from an institution that met the standards of academic quality comparable to an accredited institution.  Because defendant Contreras' wrongful conduct occurred under the previous statute and because defendant Contreras voluntarily exercised his discretion under the revised statute consistent with the requirements of the Constitution, we find that the record in this case does not support the district court's conclusion that its finding of a constitutional violation under the former version of the statute will in any way guide defendant Contreras' future conduct.").

For these reasons, the Court concludes that Plaintiff's request for fees and costs under § 1988 should be granted.  This conclusion, however, does not mean Plaintiff is entitled to the full amount of fees and costs requested.  In *Guy*, the Ninth Circuit expressed

no view on how large the award should be—it simply remanded to the district court with instructions that the plaintiff should be allowed to recover "some amount of costs and attorney fees" while emphasizing that, "[o]f course, in determining the amount of such an award, the trial court may consider, among other things, Guy's limited success in obtaining only nominal monetary damages." *Guy*, 608 F.3d at 590.  On remand, the plaintiff sought "an award of attorney's fees and non-taxable costs in the amount of $518,770 and $34,313.54, respectively" but the district court awarded a total of only $39,990.  *Guy v. City of San Diego*, 2011 WL 1486307, *1-2 (S.D. Cal. 2011).  The court arrived at that figure by (1) calculating the amount of fees and non-taxable costs that were reasonably incurred for trial and appellate work ($349,801.49); (2) concluding that the plaintiff should receive only 10% of that sum "when viewed against the backdrop of the entire case consisting of the number of claims and defendants as well as damages obtained"; (3) calculating the amount of fees and non-taxable that were reasonably incurred when briefing the issue of fees and costs ($4,900); and (4) concluding that the plaintiff should receive 100% of that sum.  *Id.* at *3-4.

Like the district court in *Guy*, the Court concludes that an award of 10% of the fees and non-taxable costs Plaintiff reasonably incurred during trial and appellate proceedings would be "reasonable and supportable considering the extent of success on the merits (Plaintiff alleged numerous causes of action against multiple Defendants but only prevailed on one claim against one Defendant in [a nominal amount]), the time and labor expended in prosecuting this action, the difficulty of the legal and factual issues presented, the legal skills required to obtain such jury award, the potential inability of Plaintiff's counsel to prosecute or defend other cases, the public good flowing from Plaintiff's successful prosecution of this case, and the desireablity of the present case."  *Id.* at *3.  *See generally Hensley v. Eckerhart*, 461 U.S. 424, 436-37 (1983) ("If . . . a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. . . .  [T]he most critical factor is the degree of success obtained. . . .  There is no precise rule or formula for making

these determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success.").[10]

The appropriateness of this 10% figure is underscored by *Mahach-Watkins*, in which the plaintiff "sought $686,796.74 in attorney's fees" but the court only "awarded $136,687.35 in attorney's fees, . . . due to Mahach-Watkins's limited success in her § 1983 suit." *Mahach-Watkins*, 593 F.3d at 1058. That reduction, which the Ninth Circuit affirmed over the plaintiff's objection, represented 20% of the requested sum. A 20% award here, however, would be too generous because *Mahach-Watkins* presented a stronger case for a sizeable fee award than this case presents—as noted in earlier portions of this order, the first and second factors were more favorable to the plaintiff in *Mahach-Watkins* than they are to Plaintiff here.

For similar reasons, the Court is unpersuaded by Plaintiff's contention, raised during oral argument, that the relevant Ninth Circuit authorities create a permissible range of between 20% (*Mahach-Watkins*) to 60% (*Wilcox*) that district courts must utilize when calculating fees in excessive-force cases resulting in an award of nominal damages. In those cases, the Ninth Circuit merely concluded that the district court did not abuse its discretion when arriving at a specific percentage figure that was appropriate under the specific facts of each case. The facts of this case are less supportive of a fee award than the facts of *Mahach-Watkins*, so it would not make sense to treat the 20% figure chosen by the district court in that case as some sort of floor.

Likewise, Plaintiff's heavy emphasis during oral argument on *Fry* is unavailing. As discussed in earlier portions of this order, the facts of this case are less supportive of a fee award than the facts of *Fry*, most notably because of the wider disparity between the amount of damages sought and obtained. *Fry*, 873 F.3d at 827 ("We note, however, that the difference between the damages sought and those awarded here is less dramatic than in other cases where courts have denied fees. In *Farrar*, the Supreme Court denied fees where

---

[10]    Although this case involved a wider disparity than *Guy* between the amount of damages sought and obtained, the Court concludes, in its discretion, that this distinction does not compel an even greater reduction than the 90% reduction in *Guy* given all of the circumstances.

the plaintiff asked for $17 million in damages and received $1.  And we have denied attorney's fees [in *Romberg*] where plaintiffs had sought $2 million dollars in compensatory and punitive damages, but requested only 'some sum like one dollar' at closing argument.") (citations omitted).

As for Plaintiff's request for the fees he incurred while seeking fees, the Court disagrees with the district court's decision in *Guy* to the extent it suggests Plaintiff should be allowed to recover 100% of those fees.  The Ninth Circuit has held that "a district court does not abuse its discretion by applying the same percentage of merits fees ultimately recovered to determine the proper amount of the fees-on-fees award." *Schwarz v. Sec. of Health & Human Servs.*, 73 F.3d 895, 909 (9th Cir. 1995).  *See also Richard T. L. v. Dudek*, 2025 WL 1222435, *6 (S.D. Cal. 2025) ("[A]s with the briefing on the merits, the Court should consider the results obtained and may reduce 'fees for fee litigation' where the fee application is only partially successful.").  That approach seems particularly appropriate here because Plaintiff overreached in his fee motion by requesting 100% of his fees and costs, with no fallback arguments or alternative calculations offered.  The Court thus concludes that Plaintiff should only be allowed to recover 10% of the fees he reasonably incurred when seeking fees.

Turning to the reasonableness of Plaintiff's requested fees and costs, Officer Miller raises five specific objections—he (1) objects to the fees attributable to one of Plaintiff's attorneys, because that attorney is not licensed in Arizona, made no court appearances, and performed duplicative work (Doc. 190 at 17-18); (2) objects to the imposition of any fees related to his unsuccessful interlocutory appeal, because Plaintiff could have filed a separate application for those fees with the Ninth Circuit (*id.* at 19); (3) argues that the overall number of hours billed by Plaintiff's lead counsel (822.5 hours) was excessive, because this case was not novel or complex (*id.*); (4) argues that any fee should be drastically reduced to account for the discrepancy between the amount sought by Plaintiff and the amount ultimately obtained (*id.* at 20); and (5) argues that the contingent nature of Plaintiff's fee agreement supports an award of no fees (*id.* at 21).

Officer Miller's first objection is unavailing. The other attorney was licensed in Arizona at all relevant times (Doc. 192 at 7) and the Court is satisfied that the relatively modest amount of time billed by that attorney was not duplicative.

Officer Miller's second objection is also unavailing. Even assuming Plaintiff could have sought to recover his interlocutory appeal-related fees directly from the Ninth Circuit, Officer Miller has not cited any authority (and the Court is aware of none) holding or even suggesting that Plaintiff's failure to do so resulted in a forfeiture. *Guy*, 2011 WL 1486307 at *4 n.2 ("The court also rejects Defendant's argument that Plaintiff is not entitled to recover reasonable attorney fees on appeal.").

Officer Miller's third objection lacks merit. This was a difficult case made even more time-consuming by some of the twists and turns occasioned by Officer Miller's litigation strategy, which included not just the interlocutory appeal but also unsuccessful attempts to resist discovery (*see, e.g.*, Docs. 33, 38), an unsuccessful stay request (Doc. 103), an unsuccessful petition for certiorari to the Supreme Court (Doc. 193), and some aggressive tactics on the eve of and during trial.

As for Officer Miller's fourth objection, the Court agrees that a drastic reduction is warranted in light of Plaintiff's lack of success in obtaining a damage award—the 90% reduction discussed above accomplishes this objective. *Guy*, 2011 WL 1486307 at *3-4.

Officer Miller's fifth objection lacks merit, particularly in light of Plaintiff's counsel's avowal that he will not be splitting the award with Plaintiff. (Doc. 192-1 ¶ 7.)

The overall amount sought by Plaintiff is $458,508.24. (Doc. 192 at 11 ["In total, Plaintiff seeks $449,825.00 in fees and $8,683.24 in expenses."].) That figure must be reduced by 90% for the reasons discussed above. This results in a final award of $45,850.82.

…

…

…

…

Accordingly,

**IT IS ORDERED** that:

1.    Officer Miller's renewed motion for JMOL (Doc. 183) is **denied**.

2.    Plaintiff's motion for attorneys' fees and costs (Doc. 179) is **granted in part and denied in part**.  Plaintiff is awarded $45,850.82 against Officer Miller.

Dated this 16th day of December, 2025.

_____
Dominic W. Lanza
United States District Judge